JAISER  v.  MILLIGAN et al.
Civ. No. 11351.

United States District Court,
D. Nebraska, Omaha Division.
April 21, 1954.

George L. DeLacy (of Kennedy, Holland, DeLacy & Svoboda), Omaha, Neb., and Herbert C. Hoffman, Kansas City, Mo., for plaintiff Dora M. Jaiser, and the following-named defendants: Wesley Page, Virginia Page Knop, Stanley F. Jaiser, Allan Sherman Harlan, Manson Backus Harlan and Otis Backus Harlan.

Robert B. Hamer (of Fitzgerald, Hamer, Brown & Leahy), Omaha, Neb., William H. Lamme (of Spear & Lamme), Fremont, Neb., for the following-named defendants: Harland S. Milligan, administrator of the estate of Rena S. Milligan, deceased; Harland S. Milligan in his individual capacity; Emma R. Horstman; Gertrude B. Milligan; Rose Mary Horstman, now Rose Mary Ayer; Granville M. Horstman, Arlyne R. Thompson, and John Ogden Milligan.

Kenneth M. Olds (of Siman & Olds), Wayne, Neb., for the following-named defendants: Effie Weaver and Sarah E. Woodruff.

Mark J. Ryan, South Sioux City, Neb., for the following-named defendants: Ethel L. Rohrer, Robert Rohrer and William Rohrer, Jr.

DONOHOE, Chief Judge.

Dora M. Jaiser, the original plaintiff in this action, was, prior to her death, a citizen of the state of Missouri. She had in her possession 66 certificates, endorsed in blank, representing 6,588 shares of common stock of the National Biscuit Company which were issued to her sister Rena S. Milligan, who died intestate on October 24, 1950, in Dixon County, Nebraska. These certificates were deposited in the registry of this court together

with her original complaint which stated a claim in the nature of interpleader pursuant to Rule 22(1), Fed.Rules Civ. Proc., 28 U.S.C.A. According to this complaint, the plaintiff, and certain defendants claimed the certificates as beneficiaries of an inter vivos trust; while the other defendants deny the trust and claim as heirs of Rena Milligan, deceased. The beneficiaries of the alleged trust, the number of shares allegedly constituting their respective beneficial interests and their respective places of citizenship are set forth below:

| Beneficiary | | Number of Shares | Citizen of |
|---|---|---|---|
| John Ogden Milligan | (H) | 300 | Washington |
| Harlan S. Milligan [1] | (H) | 300 | Nebraska |
| Burdette B. Milligan | (H) | 300 | Nebraska |
| Ethel L. Rohrer | (H) | 388 | California |
| William Rohrer, Jr. | (H) | 200 | California |
| Robert Rohrer | (H) | 200 | California |
| Rose Mary Horstman | (H) | 400 | Colorado |
| Granville M. Hortsman | (H) | 400 | Colorado |
| Wesley and Virginia Page | (T) | 100 | Iowa |
| Effie Woodruff | (T) | 200 | Washington |
| Roland Woodruff | (T) | 200 | Oregon |
| Arlyne R. (Milligan) Thompson | (H) | 400 | Missouri |
| Dorothy A. Jaiser | (T) | 400 | Missouri |
| Stanley F. Jaiser | (T) | 400 | Missouri |
| Elise Jaiser Good | (T) | 400 | Kansas |
| Otis Backus Harlan | (T) | 300 | Washington |
| Manson Backus Harlan | (T) | 300 | Washington |
| Allan Sherman Harlan | (T) | 300 | Washington |
| Rose Jaiser Harlan | (T) | 400 | Washington |
| Dora M. Jaiser | (D) | 700 | Missouri |

The heirs of the deceased, Rena S. Milligan, their respective relationship to the deceased, their proportionate interest in her estate as heirs, and their respective places of citizenship are as follows:

| Name | | Relationship | Share | Citizen of |
|---|---|---|---|---|
| Dora M. Jaiser | (D) | sister | 1/5 | Missouri |
| Emma R. Horstman | (H) | sister | 1/5 | Colorado |
| Gertrude B. Milligan | (H) | sister | 1/5 | Colorado |
| Ethel L. Rohrer | (H) | niece | 1/5 | California |
| Harlan S. Milligan | (H) [1] | nephew | 1/20 | Nebraska |
| Burdette B. Milligan | (H) | nephew | 1/20 | Nebraska |
| John Ogden Milligan | (H) | nephew | 1/20 | Washington |
| Arlyne R. (Milligan) Thompson | (H) | niece | 1/20 | Missouri |

All of the heirs of Rena S. Milligan shown above, and all of their children, except Dora M. Jaiser and her children, claim the stock only as heirs and deny the validity of the alleged trust. Dora M. Jaiser, her children and all other defendants herein profess the validity of the trust and claim the stock as bene-

1. Harland S. Milligan is also a defendant in his representative capacity as administrator of the estate of Rena S. Milligan.

ficiaries.[2]  At the commencement of the trial Dora M. Jaiser filed a disclaimer of any interest in the 700 shares of stock which she would be entitled to as a beneficiary if the trust were found to exist. Consequently, there are now only 5,888 shares of stock in controversy.

## Jurisdiction

The court has jurisdiction of this action since the property given to the Clerk has a value exceeding $500, and two adverse claimants of diverse citizenship are claiming the property.  28 U.S.C.A. § 1335; 3 Moore's Federal Practice (2d Ed.), sec. 22.07 et seq.; 6 Cyclopedia of Federal Procedure (3rd Ed.), sec. 22.32 et seq.  Since the amount involved exceeds $3,000, see also paragraph (1), Rule 22, Fed.Rules Civ.Proc., 28 U.S.C.A., and 28 U.S.C.A. § 1332.

The action, being equitable in nature, was tried to the court without a jury and after careful consideration of the properly admissible evidence produced at the trial, the court in keeping with Rule 52 (a), Fed.Rules Civ.Proc., 28 U.S.C.A., makes the following special

## Findings of Fact

John O. Milligan and his wife Kate Milligan came to Nebraska after the Civil War and settled on a farm in Dodge County.  During the years that followed John O. Milligan engaged in farm work, operated a retail store, purchased a mill and elevator and invested in real estate and stock.  His industrious and frugal habits were productive of substantial wealth including especially, but not exclusively, a large block of stock in the Pacific Biscuit Company and farm land in northeastern Nebraska.  However, this accumulation of material wealth was not the only blessing of the union of John O. and Kate Milligan, for nine children were born of their marriage.  Some of these children predeceased him, but others survived and shared the fruits of his labor which he passed on during his lifetime without testamentary formality and the necessary incidents of estate administration according to the laws of descent and distribution.

Glen Milligan, the first born, is now dead, but left surviving him a daughter, Mrs. Ethel Rohrer, and two grandchildren, Robert and William Rohrer.  All three of these survivors are parties to this suit.  Joseph Milligan, the second child, died without issue and is not in any way involved in this litigation.  Rena Milligan, the third born, also died without issue, but she survived her father, John O. Milligan, and received substantial property from him by inter vivos gifts, including the stock in this suit. Dora Milligan Jaiser, the fourth child, was the original plaintiff herein.[3]  She passed away during the course of this case and is survived by four children, Rose Jaiser Harlan, Elise K. Jaiser, Dorothy Jaiser and Stanley Jaiser and three grandchildren, Manson B. Harlan, Otis B. Harlan and Allan Sherman Harlan (children of Rose Jaiser Harlan).  All of the children and grandchildren of Dora M. Jaiser are parties to this action.

Emma Milligan Horstman, the fifth child of John and Kate Milligan, is living and has two children, Granville M. Horstman and Rose Mary Horstman Ayer. These three are also parties to this suit. The sixth child, John Ogden Milligan, is dead.  However, he left surviving four children who are involved herein, namely: Harlan S. Milligan, John O. Milligan, Arlyne R. (Milligan) Thompson and Burdette Byron Milligan.  Gertrude Milligan, the seventh child, and Granville Milligan, the eighth child, died without issue, and are not involved in this case. The ninth child, Emmet Milligan, also died without issue, and though he is

2. In the list of beneficiaries and heirs, those claiming as heirs are designated (H) and those claiming through the trust are designated (T).

3. Since this memorandum was prepared, Stanley F. Jaiser, Administrator of the Estate of Dora Jaiser, has been substituted as party plaintiff; but this does not change any of the findings.  Where "plaintiff" is used in the body of the memorandum it refers in most instances specifically to Dora Jaiser.

survived by a widow, Viola Milligan, she is not a party to this action.

The only other parties to this suit are two nieces and two nephews of John O. Milligan, Sr. He had two sisters: Eva Woodruff, deceased, who is the the mother of Charles Roland Woodruff and Effie Woodruff Weaver, parties defendant; and Mary Page, deceased, who is the mother of Wesley Page and Virginia Page Knop, also parties defendant.

As stated before, John O. Milligan, Sr. distributed all of his wealth before he died. A substantial quantity of stock issued by the Pacific Coast Biscuit Company, other securities, and a substantial amount of farm land were received by Rena Milligan. Although it appears that John O. Milligan's other surviving children also received property from him it is not possible to ascertain from the evidence whether they received more or less than Rena. However, this is not of consequence, since no one here questions the validity of the transfers from John O. Milligan to his children.

Rena Milligan had only an elementary education and was never employed by anyone for compensation. She did domestic work in her parents' home at Scribner and Wakefield, Nebraska, and after her mother's death in 1916, she took over the housekeeping for her father and her unmarried brothers who lived at home.

Plaintiff, Dora (Milligan) Jaiser, next younger than Rena, received formal education in the public schools and also attended a business college where she received commercial training. Plaintiff was employed by her father first, and later by others, as a bookkeeper and stenographer. In 1893, she left home and went to Kansas City, Missouri, where she worked until 1896, when she married Mr. Jaiser. Although she took an interest in her husband's real estate and insurance business, and assisted him in many ways in his work, her time was devoted primarily to the duties of a housewife and mother.

In 1926, John O. Milligan, Sr. died. It was only natural that after her father's death, Rena would turn to her closest sister, Dora M. Jaiser, for advice and counsel. Rena consulted with Dora Jaiser and her husband concerning the management and investment of her property; and it appears that Mr. Jaiser acted as Rena's agent in handling certain transactions for her prior to his death in 1928. The court is unable to determine the nature and extent of the business relationship between Rena and Mr. Jaiser because the evidence in this respect leaves too much to speculation. Dora Jaiser destroyed all of her husband's books and records shortly after his death.

At this juncture the court is inclined to make a few general comments on the factors which have been taken into consideration in evaluating the testimony of the plaintiff, since its credibility, and the weight to be attached to it, are crucial factors in the disposition of this case. Her testimony was given by deposition so the court had no opportunity to observe her appearance and demeanor while testifying. At the time her testimony was actually taken, she was a party with a substantial personal pecuniary interest in the outcome of the case; and although she had filed a disclaimer by the time her testimony was offered,[4] she was not, even at this stage, a completely disinterested witness since her children and grandchildren are also parties with substantial pecuniary inter-

---

4. The court does not intend to speculate as to the motives of plaintiff for filing the disclaimer. However, it should be mentioned that her testimony would have been subject to objection under the Nebraska Dead Man's Statute, Sec. 25–1202, R.R.S.Neb.1943, if she had not disclaimed any interest. Cf. In re Estate of Tilton, 129 Neb. 872, 263 N.W. 217; Brooks v. Brooks, 105 Neb. 235, 180 N.W. 41. Her relationship to other parties does not, in this case, give her a "direct legal interest" within the meaning of the statute so as to render her testimony inadmissible. See Craig v. Seebecker, 135 Neb. 221, 280 N.W. 913; Rine v. Rine, 100 Neb. 225, 158 N.W. 941.

ests in the case.[5] Dora Jaiser's testimony was given from a hospital bed. She was eighty years old at the time and was suffering from a serious heart ailment. Because of her condition, cross-examination had to be discontinued prior to its completion and was not resumed. Her recent death bears witness to the wisdom of discontinuing the cross-examination. The partial failure of cross-examination which necessarily occurred was not such as to induce the court to exclude, or disregard, plaintiff's direct examination. A cross-examination begun, but unfinished through no fault of the witness or her attorney, suffices if, as is the case here, its purposes have been substantially accomplished. V Wigmore on Evidence (3rd Ed.), sec. 1390, p. 110.[6] Counsel's cross-examination was extensive and skillful. On several occasions in the course of the cross-examination counsel was able to show by documentary evidence,[7] and the witness' answers that her testimony on direct had not been entirely accurate.[8] However, considering the age and physical condition of the witness together with the fact that she was testifying about transactions occurring ten to twenty years prior to the taking of her deposition, it is understandable that her recollection was in many respects faulty and the court is not inclined to disregard her testimony under the doctrine "falsus in uno, falsus in omnibus."[9] There is, in the court's opinion, a substantial reason for giving credence to her testimony. She had in her possession certificates of stock which had been endorsed in blank. If she had fraud in her heart, there would have been a simpler way to perpetrate it then by delivering the stock to this court and perjuring herself to recover it back for her loved ones.

After her husband's death, Dora Jaiser continued to give consultation to her sister Rena; and although plaintiff denied that she ever acted as Rena's agent. or custodian of Rena's property or that. she ever handled Rena's funds, except. dividend checks from the stock in suit,. the evidence convinces the court otherwise.

On September 20, 1930, Dora Jaiser wrote her sister Rena the following letter:

"Dear Rena—

"I received the check today for the P.C.B. Bonds & interest & have given you credit for $9000 for Bonds Redeemed and $3870 for 6 mos interest & have given myself credit for

---

5. A rough estimate indicates that as beneficiaries the Jaiser family would acquire 2,640 shares of stock; while as heirs they would succeed to only 1,317.

6. Counsel for defendant heirs did not move to exclude plaintiff's testimony on the ground that there had been a failure of cross-examination so this question was not formally raised.

7. Plaintiff's counsel has requested the court to disregard the extrinsic evidence which in effect impeached certain answers given by plaintiff on cross-examination. The rule is settled "that a witness cannot be impeached on a collateral matter except, within the court's discretion, by cross-examination. Extrinsic evidence is not admissible for that purpose." 58 Am.Jur. Witnesses, Secs. 783–785, p. 432, et seq.; Yoder v. United States, 10 Cir., 1934, 71 F.2d 85; Vanderpool v. State, 115 Neb. 94, 211 N.W. 605. However, the court takes the view that the extrinsic evidence in this case

was material to the issues and did not relate to facts which were "collateral". In most instances the evidence related to transactions (other than the transaction involved in this suit) between Rena. Milligan and Dora Jaiser. These transactions were offered to prove that Dora was a general agent of Rena and that the transaction in suit was one falling into the general plan of the agency. See II Wigmore on Evidence (3rd Ed.), secs. 375, 377, p. 304, et seq., for a discussion of the principle. Viewing the evidence in this light, the defendant heirs could have introduced it as part of their own case. Consequently it cannot be said to relate to a collateral matter. See Vanderpool v. State, 115 Neb. 94, 211 N.W. 605.

8. The inconsistencies of her testimony will be pointed out later.

9. See III Wigmore on Evidence (3rd Ed.), sec. 1008, p. 674.

$5000 as you wrote me some time ago I will put the money out at Interest & give the children the Interest for the present, & thank you very much for this nice gift—I enclose a check for $210.00 for Emmett's Interest on his 7 Bonds which you can send to him when you write.

"I also collected Sep 15th Interest on your $5000 Gov. Bond—87.50 & I don't remember now what you said to do with this Bond—

"Be sure & mark off these Bonds on your list which have been paid. I think it is a good idea to burn this Letter after you have read it. The tax ferrets seem to be hot on our trail. I had another letter from Omaha—& also my lawyer came down Monday as he had some communication from Washington."

This letter clearly indicates that plaintiff did not give a complete picture of the business relationship between herself and Rena. It also suggests the reason why plaintiff was reluctant to make a full disclosure; why she refused to produce papers unless forced to do so; and why she had destroyed her husband's books and records. Her attitude exhibits, if not an obvious consciousness of intentional and unlawful tax evasion, at least a desire by her to be something less than fair with the taxing officials. This is best illustrated by a letter which plaintiff wrote Rena nine years later in which she states:

"* * * Better be careful about showing your books to anyone, as you remember you have been in serious trouble on your Federal Income tax, as you have made sworn statements to the Federal Inc. Tax Department that you owned nothing down here & had no income from here."

We need not delve deeper into plaintiff's motive for refusing to paint an accurate picture of her business relationship with Rena. Suffice it to say, contrary to her denial, she did act as Rena's agent in connection with many business transactions and handled substantial funds belonging to Rena. The record is replete with letters written by plaintiff to Rena containing accountings of the latter's funds.

In a letter written May 20, 1931, plaintiff states to Rena:

"Your letter of the 18th rec'd & glad to hear from you. I enclose my check for $1500.00 as you request.

"I bought some new loans from the Bank last week as some of my loans were paid off. & I have given you 2 new Loans.

| | | |
|---|---|---|
| "Loan No 1516 Dr. Verden 5½% | | 4500. |
| "119. West 68th St. | | |
| "Accr Int from Dec 20-30 | | |
| "To May 20-31. | | 103.12 |
| "Due June 21-1933. | | |
| "Loan No 1581. C. A. Brand. 5½%. | | 4500. |
| "Accr Int. From Dec. 13-30 | | |
| "To. May 20-31- | | 107.93 |
| "Due Dec 13-1933. | | |
| | | $9211.05 |
| "I paid Box Rent Safety Box No 525- | | |
| $20 & charged you with $10.00 | | 10.00 |
| | | $9221.05 |

"According to my Books This leaves you here the money from the Government Bond $5000.00 & a balance of $1105.62 If I have gotten everything down that I should have. You did not say What to do about the $5000.00 from the Gov. Bond—unless you want the money up there for something. I can probably get a loan here.

"You can let me know about it & if you should not want these loans it is alright If you want the money let me Know. We can get some good loans now as there is considerable building & anything I buy from the Bank they agree to take back any time."

In a letter dated April 4, 1932, plaintiff stated to Rena:

"We got the money on the P.C. Bond interest, and I sent Emmett a check for his interest, and have credited your acc. with your interest and have some other interest collected in which I enclose statement for. Nothing from the R. Mt. Fuel Co. and don't think there will be."

On February 24, 1934, plaintiff wrote Rena:

"I received the returns on the Canadian Interest Coupons, and give a list of the charges on the slip enclosed."

In December of 1935, plaintiff advised Rena by another letter that

"Collections are not coming in so good & it is harder all around to get people to pay their taxes. I have advanced them money and they pay me back by the month. Some of them will be able to keep their property that way."

And in February of the following year she wrote Rena as follows:

"In regard to the Rocky Mountain Fuel Stock—I have a record in my book of Nov 28–1931—Received from R.S.M. Rocky Mt. Fuel Co Stock 50 sh Pref stock

50 " com " When I go down to the Bank I will look over the stock certificates & send you the amount of shares which I have—If you want some of them transferred to someone else let me know & I will do whatever you say."

These, and many other letters of the same general tenor which were introduced in evidence, convince the court that plaintiff did act as Rena's agent in connection with many and varied transactions, both before and after the transaction which is the basis of this suit.

It seems undisputed that sometime in the year 1932, Rena wrote to the Guarantee Trust Company in New York requesting this company to send dividends from National Biscuit Company Stock, owned by Rena, to her sister Dora. The dividends on the stock came to Dora from about the middle of 1932 to sometime in 1937. Dora deposited these dividend checks in her own bank account and then would send checks to Rena equalling the amount of the deposited dividend checks.

With regard to commercial transactions Rena had little confidence in professional legal advisers and did not utilize standard business practices. She distrusted attorneys and seldom used banks. The very certificates involved herein were carried about by Rena in an old satchel. Plaintiff, at different times wrote to Rena and suggested that she be more careful in safeguarding her papers. At one time she advised Rena to forward certain executed, but undelivered, deeds for safekeeping in a safety deposit box, which was held in plaintiff's name in a Kansas City Bank. The rental for this box was paid in part with Rena's funds.

In the fall of 1936, Rena went to visit her sister Dora in Kansas City, Missouri. She took the stock with her and when they were visiting at Dora's home Rena stated that she wanted to transfer the stock to Dora. Dora suggested that they go to the First National Bank in Kansas City, Missouri; which they did. They went to one of the private rooms in the vault and requested that one of the bank officers come in. Miss Haines, an assistant cashier in the women's department, came in and was introduced by Dora to Rena. Rena told Miss Haines that she had some stock that she wanted to transfer to Rena. Rena took out the stock and endorsed each certificate in blank. As Rena signed each certificate she handed it to Miss Haines who would stamp the following words beneath Rena's signature:

"Signature Guaranteed

"First National Bank, Kansas City, Mo."

and just beneath the stamped words Miss Haines would affix her own signature. When all of the certificates had been signed by both Rena and Miss Haines in the manner as set forth above, Miss Haines left the room. Then Rena took the certificates and handed them to Dora and said "I give this to you, Dora, all I want is the dividends, I don't want the stock." Then Rena suggested that she and Dora make a list of the persons who were to receive the stock. Rena said that she wanted most of it to go to her nieces and nephews, so she suggested that Dora

make a memorandum of each family and orandum Rena called off the names and their children. In preparing the mem- Dora wrote them down as follows:

"John O. Milligan Sr.
Rena

Family Set Up            NB

John O. Milligan Jr.

|   |   |   |   |   |
|---|---|---|---|---|
| | Harlan Milligan Scribner | N.B. | 300 | |
| | John O. Milligan Jr. " | N.B. | 300 | |
| 4 | Burdette Milligan " | N.B. | 300 | |
| | Arlene Milligan " | N.B. | 400 | 1300 |

Emma Horstman Denver

|   |   |   |   |   |
|---|---|---|---|---|
| 2 | Granville M. Horstman | N.B. | 400 | |
| | Rosemary Horstman | N.B. | 400 | 800 |

Glen Milligan Redlands Cal.

|   |   |   |   |   |
|---|---|---|---|---|
| | Ethel Rohrer Daughter | N.B. | 388 | |
| 3 | Wm. Rohrer, Jr. Son Ethel | N.B. | 200 | |
| | Robert Rohrer " " | N.B. | 200 | 788 |

Emmett Milligan
      No Children

Dora Jaiser Family

|   |   |   |   |   |
|---|---|---|---|---|
| | Dorothy Jaiser | N.B. | 400 | |
| | Stanley Jaiser | N.B. | 400 | |
| | Elise K. Jaiser | N.B. | 400 | |
| | Rose Jaiser Harlan, Seattle | N.B. | 400 | 2500 |
| 7 |   Has 3 sons—3 apiece here | | | |
| | Manson Backus Harlan Seattle | N.B. | 300 | |
| | Otis Backus " | N.B. | 300 | |
| | Allan Sherman " | N.B. | 300 | |

Section 5.

The Industrial Society

Through Sister—Mary
        Grandchild

|   |   |
|---|---|
| Virginia Page—Bedford Iowa | NB |
| Wesley Page " " | 100 |

Mother Nancy page Grandchild
  Rena helped in chicken business

Through another sister—Eva
    Grandchild
  Effie Woodruff, North Yakima Wash  NB  200
Roland Woodruff " "   NB  200

Gertrude Milligan single

J. L. Milligan San Gabriel Cal? Single
              no children

Dora Jaiser (Trustee)        NB  700       "

After each name Dora wrote N.B. for National Biscuit Company and certain numbers which represented the number of shares of stock in that company that each relative was to receive.

Upon completion of the memorandum Rena suggested that to "guide" Dora as to who the shares were to go that they write the names in pencil on the certificates. This they did. In the schedule below is listed the exhibit number of each certificate of stock, the number of shares it represents, the person who was to receive it, who wrote that person's name in pencil on the certificate and the relationship of the named person to Rena Milligan:

| Exhibit | Shares | Name | Written By | Relationship |
|---|---|---|---|---|
| 1 | 100 | Arlyne R. Milligan | Rena | Niece |
| 2 | 100 | Arlyne R. Milligan | Rena | Niece |
| 3 | 100 | Arlyne R. Milligan | Rena | Niece |
| 4 | 100 | Arlyne R. Milligan | Dora | Niece |
| 5 | 100 | Rosemary Horstman (Ayer) | Rena | Niece |
| 6 | 100 | Rosemary Horstman (Ayer) | Rena | Niece |
| 7 | 100 | Rosemary Horstman (Ayer) | Rena | Niece |
| 8 | 100 | Rosemary Horstman (Ayer) | Rena | Niece |
| 9 | 100 | Effie Woodruff | Rena | Cousin |
| 10 | 100 | Effie Woodruff | Rena | Cousin |
| 11 | 100 | Wesley Page and Virginia Page | Dora | Cousins |
| 12 | 100 | Roland Woodruff | Rena | Cousin |
| 13 | 100 | Roland Woodruff | Rena | Cousin |
| 14 | 100 | E. L. Rohrer | Dora | Niece |
| 15 | 100 | E. L. Rohrer | Rena | Niece |
| 16 | 100 | E. L. Rohrer | Rena | Niece |
| 17 | 88 | E. L. Rohrer | Rena | Niece |
| 18 | 100 | Robert Rohrer | Rena | Grandnephew |
| 19 | 100 | Robert Rohrer | Dora | Grandnephew |
| 20 | 100 | William Rohrer, Jr. | Rena | Grandnephew |
| 21 | 100 | William Rohrer, Jr. | Dora | Grandnephew |
| 22 | 100 | G. M. Horstman | Dora | Nephew |
| 23 | 100 | G. M. Horstman | Rena | Nephew |
| 24 | 100 | G. M. Horstman | Dora | Nephew |
| 25 | 100 | G. M. Horstman | Rena | Nephew |
| 26 | 100 | Harland Milligan | Dora | Nephew |
| 27 | 100 | Harland Milligan | Dora | Nephew |
| 28 | 100 | Harland Milligan | Dora | Nephew |
| 29 | 100 | John Ogden Milligan | Dora | Nephew |
| 30 | 100 | John Ogden Milligan | Dora | Nephew |
| 31 | 100 | John Ogden Milligan | Dora | Nephew |
| 32 | 100 | Burdette Milligan | Dora | Nephew |
| 33 | 100 | Burdette Milligan | Dora | Nephew |
| 34 | 100 | Burdette Milligan | Dora | Nephew |
| 35 | 100 | S. F. Jaiser | Rena | Nephew |
| 36 | 100 | S. F. Jaiser | Rena | Nephew |
| 37 | 100 | S. F. Jaiser | Rena | Nephew |
| 38 | 100 | S. F. Jaiser | Rena | Nephew |
| 39 | 100 | Allan Sherman Harlan | Dora | Grandnephew |
| 40 | 100 | Allan Sherman Harlan | Dora | Grandnephew |
| 41 | 100 | Allan Sherman Harlan | Dora | Grandnephew |
| 42 | 100 | Miss Elise Jaiser (Good) | Rena | Niece |

| | | | | |
|---|---|---|---|---|
| 43 | 100 | Miss Elise Jaiser (Good) | Rena | Niece |
| 44 | 100 | Miss Elise Jaiser (Good) | Rena | Niece |
| 45 | 100 | Miss Elise Jaiser (Good) | Rena | Niece |
| 46 | 100 | Miss Dorothy Jaiser | Rena | Niece |
| 47 | 100 | Miss Dorothy Jaiser | Rena | Niece |
| 48 | 100 | Miss Dorothy Jaiser | Rena | Niece |
| 49 | 100 | Miss Dorothy Jaiser | Rena | Niece |
| 50 | 100 | Mrs. Rose Harlan | Rena | Niece |
| 51 | 100 | Mrs. Rose Harlan | Rena | Niece |
| 52 | 100 | Mrs. Rose Harlan | Rena | Niece |
| 53 | 100 | Mrs. Rose Harlan | Rena | Niece |
| 54 | 100 | Manson Backus Harlan | Dora | Grandnephew |
| 55 | 100 | Manson Backus Harlan | Dora | Grandnephew |
| 56 | 100 | Manson Backus Harlan | Dora | Grandnephew |
| 57 | 100 | Otis Backus Harlan | Dora | Grandnephew |
| 58 | 100 | Otis Backus Harlan | Dora | Grandnephew |
| 59 | 100 | Otis Backus Harlan | Dora | Grandnephew |

After all of the names had been written in pencil on the certificates, Rena again piled them together and handing them to Dora said:

"These are yours. * * * According to my instructions see that each beneficiary gets them after my death."

Dora replied that she would see that Rena's wishes were carried out and then put the stock certificates in an envelope which she placed in her safety deposit box. The stock certificates were kept in Dora's safety deposit box until shortly prior to the institution of this law suit. Neither Dora, nor anyone else, made any notations or wrote anything on the stock after it was given to Dora by Rena in the fall of 1936.

The court specifically finds that when Rena handed the stock certificates to Dora, Rena intended to irrevocably transfer the legal title and ownership of the stock to Dora and Rena intended Dora to pay the dividends to her, Rena, for life and upon her death to give the certificates to the persons whose names appear in pencil thereon.

After her short visit with her sister Dora, Rena returned to her home in Nebraska. Sometime in 1937 the dividend checks from the stock in suit stopped coming to Dora. It appears that Rena made arrangements to have the dividends come directly to her. Rena did not advise Dora of this fact and Dora made no inquiry either of Rena, the National Biscuit Company, or the Guaranty Trust Company, relating to the dividends. However, it seems that all the dividends from the stock in suit went either indirectly (through Dora)[10] or directly to Rena until the date of the latter's death.

Sometime in 1937, Rena found it necessary or desirable to borrow money, so she wrote to Dora suggesting that the National Biscuit Company stock be pledged as security for a loan. Dora refused to send her the stock, stating:

"I hate to see you put up your Natl Bisc Stock to the Bank for security, as I am afraid you will not see it again."

Later an attorney named Abbott, from Fremont, Nebraska, who represented Rena, wrote to Dora in an effort to get

10. Dora testified that she received $76,420.80 in dividends from the National Biscuit Company stock for Rena. Checks from Rena to Dora in the sum of $76,623.88 have been introduced in evidence. The court accepts plaintiff's testimony that these checks represent payment of the dividends by her to Rena.

the stock certificates from her. Dora, after consulting her own lawyer, refused to return the certificates. No further action was taken by Rena to repossess the stock.

In January of 1945, Dora wrote a letter to Rena which reads in part as follows:

"About your National Biscuit Co. stock, I think it would probably be alright to begin to transfer some of that stock out of your name. That is, if you have paid off the mortgages on your farms. $3,000 can be given to one person in a year without paying tax on gifts to the federal government, and $30,000 all in one year can be given away without paying a gift tax to the government * * * "

It does not appear that Rena, after receiving this letter, made any effort to have the transfer of the stock, which occurred in 1936, recorded on the corporation's books.

Sometime after Rena's death, those in charge of her personal effects uncovered the following memorandum in Rena's handwriting:

"8598 Shares of National Biscuit of N.Y.
I do hereby leave this stock to my nieces, nephews and great ones each to share alike after my passing.
(If none come. * * * [11] 5 Div go alike)

Rena Milligan"

On the reverse side of this memorandum Rena had written:

"Names are to be sent to the National Biscuit Co. of N.Y. at my passing. Names Dor Jaiser 201 E 75 K C Mo. 20 N. * * * [12] Redlands, Calif; Mrs. Wm Ethel Rohrer Mrs E R Horstman 995 South Vine Street (4) Denver Colo. H S Milligan 3 Scribner Nebr.

& John Aryln & B 3
Dora has 3 gran       3
Emma " 4 "          4
Ogden [12] ch her 11
Mrs. Ethel Rohrer ⅔₅"

No date appears on this memorandum. Counsel for the defendant heirs argues, and persuasively, that the foregoing instrument was written between August 2, 1948, when Ogden Milligan's eleventh grandchild was born and June 4, 1949, when Emma Horstman's fifth grandchild was born. The court is inclined to accept counsel's view of the date of execution of this memorandum and specifically finds that it was written during the period suggested.

In conclusion, the court specifically finds, for whatever bearing it may have upon this case, that Rena Milligan did during her lifetime attempt to make inter vivos gifts of much of her property to her close relatives. In this connection it should be mentioned that the court has made no effort to determine the legal validity of such purported gifts but merely observes from the evidence that Rena attempted transfers in the following manner:

1. February 28, 1948: Deed to farm land in Dixon County, Nebraska, from Rena Milligan, grantor, to Effie Weaver, held in escrow by John Gross to be delivered to Effie Weaver upon Rena Milligan's death.

2. August 28, 1947: Deed to farm land in Dixon County, Nebraska, from Rena Milligan, grantor, to Viola Milligan, subject to reserved life estate in the grantor, held in escrow by John Gross to be delivered to Viola Milligan upon Rena Milligan's death.

3. April 7, 1949: Deed to certain lots in the village of Wakefield, Dixon County, Nebraska, from Rena Milligan, grantor, to William G. Rohrer, held in escrow by John Gross, to be delivered to Wil-

11. Not discernible—see Exhibit T.

12. This word is not clear, but it probably spells "Ogden" (also Augden).

liam G. Rohrer upon Rena Milligan's death.

4. April 7, 1949: Deed to farm land in Sully County, South Dakota, from Rena Milligan, grantor, to Dorothy A. Jaiser, held in escrow by John J. Gross to be delivered to Dorothy A. Jaiser upon Rena Milligan's death.

5. December 3, 1947: Deed to certain land in California from Rena Milligan, grantor, to Viola Mae Milligan, held in escrow by John J. Gross to be delivered to Viola Mae Milligan upon Rena Milligan's death.

6. November 30, 1950: Release of three mortgages by Rena S. Milligan, mortgagee, in favor of Harland S. Milligan, successor to John O. Milligan, Jr., mortgagor, of certain farm land in Dodge County, Nebraska; the releases were held in escrow by John J. Gross to be delivered to Harland S. Milligan at, or prior, to Rena Milligan's death.

7. January 16, 1950: Deed to land in Dodge County, Nebraska, from Rena Milligan, grantor, to Robert H. Rohrer. A deed of two acres of this same section in Dodge County was executed by Rena Milligan in favor of Mary Krondack. The manner of delivery, if any, is not clear from the evidence.

8. January 16, 1950: Deed of land in Dodge County, Nebraska, from Rena Milligan, grantor, to Byron B. Milligan held in escrow by John J. Gross to be delivered to Byron B. Milligan upon Rena Milligan's death.

9. March 8, 1944: Deed of land in Dodge County, Nebraska, from Rena Milligan, grantor, to Harland S. Milligan, subject to the reservation of a life estate.

In addition to the foregoing, Rena made gifts of money or real property to Burdette Milligan, Mr. Dealy, Stanley Jaiser, and Emmett Milligan. She gave Crowell Elevator Stock to Viola Milligan and Mexican Railway Bonds to Mrs. Mathewson. The court specifically finds that these transfers, or attempted transfers,[13] indicate, if nothing else,[14] a predisposition on the part of Rena Milligan to make a complete disposition of her property without making a will and without relying upon the laws of intestate succession.

### Discussion

From the special facts stated the court reaches the conclusion that in the fall of 1936, Rena S. Milligan made a valid, completed and irrevocable transfer of the shares of National Biscuit Company stock which are now held by the Clerk in the registry of the court to Dora Jaiser as trustee to hold for Rena Milligan until her death and then to transfer said certificates to the persons whose names had been written thereon in pencil.

By the better view it would seem that the validity of the trust involved in this case should be determined by the laws of Missouri since that is where the securities were at the time of their transfer; that is where the transaction took place; and that is where the trustee and four of the beneficiaries were domiciled. See Restatement of Conflicts, Sec. 294, p. 376; 11 Am.Jur., Conflict of Laws, Sec. 95, p. 382. However some authorities have held that the law of the domicile of the settlor (in this case Nebraska) determines the validity of a trust in personalty. See 15 C.J.S., Conflict of Laws, § 18g, page 936. But whether the court applies the law of Missouri or the law of Nebraska the same result will be reached so there is no need to reconcile the apparent split

13. See Crowell v. Milligan, 157 Neb. 127, 59 N.W.2d 346.

14. The court does not consider these transfers or attempted transfers of any significance in relation to the transfer of the National Biscuit Company Stock in the fall of 1936; and the court has not given these transfers any weight in determining the intention of Rena Milligan with regard to the transfer of the National Biscuit Company Stock in 1936.

of authority relating to the law applicable.

**■■** A trust may be defined as a fiduciary relationship in which one person holds a property interest subject to an equitable obligation to keep or use that interest for the benefit of another. Bogert, Trusts and Trustees, Sec. 1, p. 1. Generally the following elements are essential to the creation of a trust: 1) a person competent to create a trust; 2) an indication of intention; 3) property to which the trust may and does pertain; 4) a definite and complete present disposition of that property; 5) a provision, at least by implication, for the office of trustee; and 6) a person capable of holding the equitable interest in the property as beneficiary. 54 Am. Jur., Trusts, Sec. 30, p. 43. All of these essential elements are present in the case at hand.

**■** No one contends that Rena Milligan was, in the fall of 1936, incompetent to create a trust. The primary issue in this case is whether the evidence satisfactorily establishes that she had the required intention to make a trust. The evidence of this intention must be clear and convincing. See 1 Bogert, Trusts and Trustees, Sec. 49, p. 354. However, it has been held that while evidence to establish an express trust in personalty must be clear and convincing, especially if asserted after the death of the alleged settlor, a finding based upon parol and conflicting evidence is proper. Stein v. Mercantile Home Bank & Trust Co., 347 Mo. 732, 148 S.W.2d 570. The court is inclined to the view in this case that the evidence of Rena Milligan's intent to create a trust is clear and convincing. In order to create a trust it is not essential that any particular form be followed, or that the words "trust" or "trustee" be used. Whatever words may be used in the manifestation of the settlor's intention to create a trust, it is sufficient if the settlor declares the present creation of a fiduciary relationship with respect to certain property subjecting the person by whom the property is thenceforth held to the equitable duty of dealing with it for the benefit of beneficiaries according to the terms and conditions of the trust. St. Louis Uniformed Firemen's Credit Union v. Haley, Mo.App., 190 S.W.2d 636. See also O'Connor v. Burns, Potter & Co., 151 Neb. 9, 36 N.W.2d 507. Even if the language, from its surface appearance, has indicated an absolute gift to the donee, if it is followed by instructions to the donee to use the property for the benefit of certain third parties, it may be held to be a gift in trust. See In re Soulard's Estate, 141 Mo. 642, 43 S.W. 617; Satterfield v. Begley, 28 Del.Ch. 336, 43 A.2d 246. And that is substantially what we have in the case under consideration. Not only is plaintiff's testimony that Rena Milligan instructed her to hold the property for Rena's benefit for life and then to give it to the designated nephews and nieces undisputed, but it finds substantial support in the surrounding circumstances—execution of the assignment of the certificates in blank, pencilling names on the certificates by Rena, as well as plaintiff, and Rena's voluntary surrender of the certificates—all of which seem to be accepted by the parties as fact. In view of this the court has reached the conclusion that Rena intended to create a trust. The court is unable to find support in the evidence for the contention of the defendant heirs that Rena was merely making Dora her agent.

**■** The securities involved herein are properly the object of a trust and Rena Milligan made a definite and complete disposition of the securities by delivering them to Dora Jaiser in the fall of 1936. By the great weight of authority, the mere delivery of the stock certificates, unindorsed, to the donee to hold in trust, passes at least equitable ownership. 1A Bogart, Trusts and Trustees, Sec. 142, p. 14. And it seems clear that a donor of stock who executes and delivers an assignment of the stock

and delivers the stock certificate to the donee has effected a valid gift. In York's Ancillary Adm'r v. Bromley, 286 Ky. 533, 151 S.W.2d 28, it was held that a gift of stock may be made by endorsement of the certificates and delivery thereof to the donee even though the donor reserves the right to the dividends for his life, does not notify the corporation and no change is made on the books of the corporation. The delivery in that case parallels the delivery in this. For other cases supporting in principle the proposition that there has been a valid delivery in this case see: Beck v. Hall, Mo.App., 211 S.W. 127; Wilcox v. Coons, 362 Mo. 381, 241 S.W.2d 907; Noe v. Noe, 359 Mo. 867, 224 S.W.2d 77; Ridenour v. Duncan, Mo.Sup., 246 S.W. 2d 765; Blochowitz v. Blochowitz, 122 Neb. 385, 240 N.W. 586, 82 A.L.R. 949; Kennedy v. Nelson, 125 Neb. 185, 249 N.W. 546; Novak v. Reeson, 110 Neb. 229, 193 N.W. 348. Many of these cases buttress the conclusion that a delivery to a third person, under circumstances such as are present here, will, if the intention is present, make the third person a trustee for the donee beneficiaries, and not a mere agent for the donor.

Finally, the words of Rena Milligan imposed upon Dora Jaiser the duties of a trustee in relation to named beneficiaries who are all capable of holding the beneficial interest which Rena Milligan intended for them. Consequently all of the essential elements necessarily prerequisite to the valid creation of a trust are present.

Much of the evidence introduced at the trial related to the conduct and expressions of both Rena Milligan and Dora Jaiser subsequent to the creation of the trust in 1936. The court,

both at the time of the trial and now, considered this evidence properly admissible for the purpose of showing the state of mind of Rena Milligan at the time she delivered the stock to Dora Jaiser.[15] See McDonald v. Miller, 73 N.D. 474, 16 N.W.2d 270, 156 A.L.R. 1328; Troseth v. Troseth, 224 Minn. 35, 28 N.W.2d 65; Schultz v. Young, 37 N.M. 427, 24 P.2d 276; Mower v. Mower, 64 Utah 260, 228 P. 911; O'Dea v. Hybernia Savings & Loan Society, 119 Cal. App. 622, 7 P.2d 318. However, this evidence does not show that Rena did not intend to create a trust in 1936. Dora's conduct after the transaction was consistent with her position as trustee. When Rena requested a return of the stock, Dora refused to return it. It is true that some of the expressions contained in Dora's letters refer to the stock as Rena's, but considering these statements in the light of all the other evidence it appears that Dora was either being tactful or recognizing, in a layman's manner, Rena's beneficial interest in the stock.[16] This does not seem to be inconsistent with her position as trustee. As to Rena's conduct, only this need be said. Her conduct subsequent to the fall of 1936, could indicate either one of two things: a) she did not intend to create a trust in 1936, or b) she intended to create a trust in 1936, but since that time changed her mind and wanted to recover the stock. The court views the subsequent conduct, along with all the other evidence in the case, as proving the latter.

In keeping with the expressions contained in this memorandum counsel for the plaintiff shall prepare and submit for approval the appropriate judgment to be entered herein.

---

15. Dora's statements were also received for the purpose of impeachment.

16. When Dora referred to "Rena's stock" she was using the words "Rena's stock" for the purpose of identifying it and not for the purpose of describing present legal interests in the stock.