EDWARD EARLE BUTLER, appellant, v. ROBERT SHELDON BUTLER, executor-trustee of estate of Robert Spring Butler, deceased, et al., appellees.

MARGARET S. BUTLER, appellant, v. ROBERT SHELDON BUTLER, executor-trustee of estate of Robert Spring Butler, deceased, et al., appellees.

EDWARD EARLE BUTLER, appellant, v. ROBERT SHELDON BUTLER, executor of estate of Robert Spring Butler, deceased, appellee.

MARGARET S. BUTLER, appellant, v. ROBERT SHELDON BUTLER, executor of estate of Robert Spring Butler, deceased, appellee.

No. 50434.

1086

APRIL 3, 1962.

REHEARING DENIED JUNE 12, 1962.

Parrish, Guthrie, Colflesh & O'Brien, of Des Moines, for appellant Edward Earle Butler.

Steward, Crouch & Kelly and James L. Bennett, all of Des Moines, for appellant Margaret S. Butler.

Herrick & Langdon and Walter R. Brown, all of Des Moines, for appellees.

PETERSON, J.—This is an equity action involving two cases consolidated for trial. Plaintiffs pray for the establishment of a trust as to real and personal property, deeded and assigned by Eugene K. Butler and wife, Sarah, to their son Robert S. Butler

on December 2, 1929. The property had a book value of $969,-
821.79. They had three sons: Hubert, Robert and Earle. Eu-
gene, Sarah, Hubert and Robert all died prior to the action.

In this case Margaret sued for Hubert's share as the sole
beneficiary under his will, and alleged Hubert's share was held
in trust by Robert. Earle sued, also alleging Robert held his
one-third share in trust. Both parties filed claims for their
respective demands in Robert's estate. Appellees claim the
transfer was an outright gift to Robert.

The case is not an accounting action between the parties.
This question was settled in connection with settlement of law
points, and was accepted by all parties during the trial. Only
one question of whether or not a trust existed was tried, and will
be settled herein. If a trust exists as to one or both plaintiffs,
the accounting will be settled later, either by agreement of the
parties or by trial in an equity proceeding.

The District Court dismissed both petitions and claims,
holding the existence of a trust had not been established by clear,
convincing and satisfactory evidence. Both plaintiffs appeal.

I. A general statement of the facts is essential in this case
for the purpose of creating the proper background as to the
issues involved. We will outline the family history without pay-
ing too much attention at this time to the technical objections
raised by defendants. We will give them attention, infra, as
we consider the legal questions. The story of Eugene K. Butler,
one of the settlors in this case, is a typical American Horatio
Alger story. The active business life of the three generations
involved in this proceeding extends for almost one hundred
years.

Eugene K. Butler was born in 1843. His wife, Sarah, was
born in 1846. They became residents of Chicago shortly after
the Civil War. Mr. Butler worked for many years for McCor-
mick Harvester Company. He was an executive in the company
and some years after he commenced his work, by reason of his
energy and intelligence, he reached the point where his salary
was $50,000 per year. Based partly on receiving such a fine
salary and partly by careful investments in Chicago and other
property he acquired great wealth.

By 1900 he had accumulated (including substantial gifts made to his three sons from time to time) a fortune of over two and one-half million dollars. He retired from the Harvester Company in 1900 and thereafter devoted his full time to maintenance and development of his investments. He had one very valuable tract of ground in the Chicago loop on which a lessee, under a ninety-nine-year lease, erected what was known as the Butler Building. He also had a smaller property in Chicago known as the Clark Street property. The annual rental on the ninety-nine-year lease was $30,000. He had made very extensive investments in buildings in Des Moines and some land adjacent to the city. He purchased a farm in Oklahoma and a valuable tract of land near Brownsville, Texas.

There were four sons born to the marriage, but one died in infancy. The eldest son, Hubert W. Butler, was born in 1868. The second son was Robert Spring Butler. He was born in 1882. The youngest son was Edward Earle Butler, one of the plaintiffs in this action. He was born in 1885.

Hubert died in 1943 at the age of seventy-five. His widow, Margaret, was born in 1890. She married Hubert in 1925. It was her first and only marriage. Hubert had been married twice before and had two children, one by each of his former wives. His first wife secured a divorce and his second wife died. Margaret is the other plaintiff in this action.

The Butler family all erected and lived in beautiful and expensive homes. Eugene K. Butler had a very large family home on Greenwood Avenue in Chicago. In 1925 Hubert built a $45,-000 home on one of his real-estate developments at Glencoe, a suburb of Chicago. In 1929 he built a new $75,000 home on his Skokie development near Winnetka, Illinois. In about 1925 Robert built an $80,000 home at 4507 Grand Avenue in Des Moines, and Earle built a home costing approximately $150,000 on or near Fleur Drive in Des Moines.

Hubert graduated from the Yale Law School in 1888, but he devoted most of his life to real-estate development in Chicago and its suburbs. His father had given him from time to time, on the basis of book value, property valued at $517,874.95. These gifts started shortly after he was graduated from college and continued until 1929. In spite of this substantial fortune

he became deeply indebted and financially embarrassed in the 1920s and 1930s. This was for two reasons: First—he did not have the ability that his father had to properly preserve and maintain his properties. Second—he was the unfortunate victim of the depression years in the two decades above mentioned.

Robert graduated from the University of Chicago in 1904 and came to Des Moines in 1906 at the age of twenty-four to manage his father's properties, and in later years his own properties.

Earle attended the University of Chicago, but left the university when Robert graduated. He came to Des Moines in 1908 at the age of twenty-three to assist in the management of his father's properties and to manage his own property, which he received from his father.

Robert and Earle were very close in their childhood and as they matured through their teens. There were many rooms in the Eugene K. Butler mansion, but the boys insisted on rooming together because of their affection for each other. They officed together in the K. P. Block in Des Moines for over forty years.

Both Robert and Earle entered World War I. Earle had some military experience in Culver Military Academy and enlisted early. He was promoted from time to time and was a Major when the war ended. When they came back from the service their father made them very substantial gifts, of Des Moines property in addition to former gifts. The book value of the properties, real and personal, which the father, Eugene K. Butler, made to his three sons throughout the years and prior to December 2, 1929, was as follows: Hubert $517,874.95; Robert $914,302.93; Earle $310,102.95.

In 1916 the parents sold their large Greenwood Avenue home in Chicago and for the next ten years divided their time between Chicago, Des Moines and Brownsville, Texas. In 1926, when Mr. Butler, Sr., was 83 years of age and Mrs. Sarah Butler was 80 years of age, they decided to move to Des Moines and make their home with their son Robert.

In 1929 Eugene K. Butler and wife, Sarah, decided they could not physically properly maintain the approximately one million dollars worth of real estate and personal property of which Mr. Butler was still the owner.

Accordingly, on December 2, 1929, Mr. and Mrs. Eugene K. Butler called Clinton Nourse, a prominent lawyer of Des Moines, to Robert's home and explained to him they desired to deed all of their real estate, and transfer all of their personal property, to their son Robert S. Butler. Robert was present at this conference. The deeds and the assignment of all personal property were duly prepared by Mr. Nourse.

In accordance with the provisions made as stated by Mrs. Sarah Butler and as stated in the documents given by Robert to Earle, Robert proceeded in the following years to carry out the verbally agreed provisions as to the property.

Eugene K. Butler died in 1931 and Sarah Butler in 1940. In carrying out the instructions which were given to Robert and assumed by him, he paid to and for his father and mother from December 2, 1929, to the date of their death the sum of $52,-258.59.

He also paid to Hubert and Margaret in accordance with instructions, and the agreement shown in the statements of Mrs. Sarah Butler, the sum of about $80,000, between December 2, 1929, and March 1, 1940, when the mother died. In order that Earle might have a more comprehensive and definite statement as to his rights in the property transferred to Robert on December 2, 1929, Robert had his attorney prepare a written agreement between him and Earle. The agreement was duly signed by Robert and Earle May 18, 1932, and is Exhibit 52 in this action. For brevity we will use the exhibit number at times hereinafter. Since this agreement is the principal basis and crux of this action, as far as Earle is concerned, we will show it in full, infra, in connection with the testimony of Earle.

In 1941, after Robert had refused to send any more money to Hubert, an action was commenced by Hubert and his wife, Margaret, in the District Court of Cook County, Illinois, against Robert and against Butler Building Inc., for the share which Hubert claimed in the property of his father. The case was removed to the United States District Court.

After somewhat lengthy negotiations between the attorneys for the respective parties the action was settled by Robert paying the sum of $71,038.44. A settlement agreement was executed between Hubert and Margaret as plaintiffs and Robert as defend-

ant, which we will show in full in connection with our discussion of Margaret's case, infra.

In 1941 Robert sold the Clark Street property in Chicago for $69,000. In 1947 he sold most of the Texas property for $43,000, reserving a part of it and reserving all mineral and oil rights. In 1951 he sold the ground on which the Butler Building had been erected, in Chicago, for $600,000.

In 1952 Robert entered into what was known as the "R. S. Butler Trust." He transferred to the trust all of the Eugene K. Butler property and all of his property with the exception of approximately $90,000. His three children were named as trustees and the trust and trustees are defendants in this action.

He had inherited under the will of Mable Janes, who was his secretary for many years, all of her property which amounted to approximately $90,000. In 1953 he established what was known as the "Janes Property Trust" and transferred all of the property which he received from her estate to the same three trustees. Said trust and trustees are defendants.

Up until Robert's death it was Earle's conviction under the document given him by Robert on December 2, 1929, and under the provisions of Exhibit 52, and under many circumstances and actions of members of the family throughout the years, that he was the owner of at least one third of the property transferred by his father to Robert.

After Robert's death Earle contacted Robert Sheldon Butler, the executor of the estate of Robert Spring Butler, deceased, and the active trustee under the R. S. Butler Trust and the Janes Property Trust. He asked Robert Jr. about his interest and share in the property transferred by his father to Robert, and its income through the years, and was then advised to his great surprise and deep disappointment that no provision had been made under the Robert S. Butler will nor under the R. S. Butler Trust for the distribution to him of any property whatsoever. In other words, in 1956, after Robert's death, for the first time Earle learned that there was a complete rejection of any trust, and a claim that the property was transferred to Robert as a gift. He then commenced the present action.

Margaret also commenced an action claiming that the settlement made with her and Hubert in 1942 was void, since there

had been no disclosure to her or Hubert about the document Earle secured on December 2, 1929, nor about the agreement, Exhibit 52.

II. In a case of this kind the legal questions depend peculiarly and principally on the state of facts. In addition to the narrative which we have heretofore made, and at the risk of slight repetition, we will make a brief analysis of the testimony of the witnesses called by plaintiffs and defendants, restricting ourselves to the matters which are material and pertinent to the issues involved. Plaintiffs' witnesses testified in substance.

Edward Earle Butler devoted much of his testimony to the history of the Butler family. As far as his case is concerned the trust situation depends on the written agreements, and several circumstances supporting such agreements, which we will discuss later. The matter of transfer of the balance of all the property owned by Eugene K. Butler to Robert appears in a statement made by Mrs. Sarah Butler to Earle late in the fall of 1929. According to Earle she said to him:

" 'Father and I have decided to turn over our property to Rob for management. He is to take care of Papa and I as long as we live. He is to see that Hubert and Margaret have a comfortable living through their lifetime. When these conditions have been met, you and Rob are to divide the remainder equally between you, and he is to give you a written agreement that you are to have at least one third of Father's estate.' "

Earle testified he received such written statement from Robert on or about December 2, 1929. It bore the signature of R. S. Butler and was witnessed by Mable Janes. Earle identified the signatures. Earle's copy was destroyed when he received a new written agreement on May 18, 1932. On demand on defendants for their copy of the December 2, 1929, memorandum they refused to produce it, and in fact declared there never had been such a document.

On a question to Earle as to its contents, he testified: "It stated that I was to have at least one third of father's estate; the real estate and $450,000 of government bonds. That figure was—it was stated in typewritten form, and in parenthesis it was stated in figures."

Exhibit 52 was then produced in court, the signatures of Earle and Robert identified, and it was offered in evidence. It is as follows:

"THIS AGREEMENT between ROBERT S. BUTLER, 'party of the first part' and E. EARLE BUTLER, 'party of the second part,' WITNESSETH:

"That the parties hereto do each agree with the other as follows:

"WHEREAS, Eugene K. Butler and Sarah R. Butler, the father and mother of the parties hereto did, on or about the 2nd day of December, 1929, convey as a 'gift' to the party of the first part, Robert S. Butler, the following described property, to-wit:

"Two (2) parcels of real property situated in the city of Chicago, Illinois: one known as the Butler Block, subject to a long-time written lease dated March 1, 1909, recorded in Book 10,483, page 70, records of Cook County, Illinois; and the other situated on Clark Street in said city, and known as Numbers 177 and 179 N. Clark Street, and

"Two (2) parcels of real property lying in Cameron County, Texas, and

"Sundry bonds and securities of the value of approximately five hundred thousand (500,000) dollars, and

"WHEREAS the tenant of said Butler Block, in erecting the building, has placed thereon a mortgage to secure certain bonds, of which there are outstanding, bonds of the face value of about $1,140,000.00, upon which there has accumulated interest unpaid, and said tenant has also permitted the taxes upon said real estate to accumulate with interest and penalties for several years, amounting to a large sum, and

"WHEREAS the party of the first part, Robert S. Butler, has furnished means of support to his father and mother and is still furnishing support for his mother, and will continue to do so, so long as she shall live, and

"WHEREAS the Government of the United States may exact a transfer, excise or estate tax upon and from said property or from the party of the first part, and the States of Iowa, Illinois and Texas may exact transfer, excise or inheritance taxes from

said property or from the said party of the first part, Robert S. Butler, and there are and will be certain general and special taxes and charges to be paid on said property from time to time, and

"WHEREAS the party of the second part, E. Earle Butler, is dissatisfied with the gift of the said property made by the father and mother of the parties hereto to the party of the first part, Robert S. Butler, and it is the desire to make an arrangement or settlement of any and all such matters for the purpose of maintaining the fraternal affection and amity between the parties.

"Now THEREFORE, it is agreed between the parties hereto that after discharging any bonded indebtedness; general taxes; special assessments; franchise, transfer, estate, inheritance or other taxes, charges or exactions against said property or against the party of the first part by reason thereof, and discharging any and all expenses and costs of litigation in relation thereto, and after paying or deducting any losses in operation of said property, and the losses, if any, in investments made or to be made, and repaying the party of the first part any sums he has or may advance, or indebtedness at any time incurred, including advances or debts for the support and maintenance of his father and mother, so as to make the party of the first part whole in all respects, then and thereafter, at least the undivided one third of the net proceeds so remaining of the said gift property shall, when said matters are all fully and finally settled, discharged, paid and realized upon, be set off and transferred by the party of the first part to the party of the second part, his heirs and assigns, either in property or in money as may at such time be found most convenient for the party of the first part.

"IT IS UNDERSTOOD AND AGREED that nothing herein contained shall prevent or hinder the party of the first part in his discretion and as he may think best, from settling any lawsuits or controversies now in view or hereafter arising, or from paying any costs or expenses in relation to said property and charging and deducting the amounts so expended and the costs thereof to or from said fund, nor shall anything herein in any manner prevent or retard the party of the first part from selling or conveying good title, free from encumbrances for and to any of said

property, whether real or personal, it being the intention hereof not to transfer or divide said property in kind, or to transfer any interest therein or lien thereon, but only to agree as to the division of the net amount of proceeds or funds arising therefrom, after making all of said deductions as above set out, or intended so to be.

"Dated this 18th day of May, A. D., 1932.

"(s) E. Earle Butler

"(s) Robert S. Butler"

He testified that after Robert's death he talked with Robert Sheldon Butler with the result as heretofore shown. Earle also testified:

"I inquired of Robert Sheldon if he knew about the instrument, Exhibit 52, and he said he did. He said they would not distribute any money to me without a court order, and they didn't intend to pay the taxes, and that if I wanted further confirmation, to call upon Mr. Dykstra, an attorney here in Des Moines."

He called on the attorney and was told there was no provision for him in Robert's will, nor in the R. S. Butler Trust.

Earle testified about the action of Hubert and Margaret in Chicago and his discussion with Robert about it. He told Robert to spend $100,000 to settle Hubert's case, if necessary.

Margaret discussed at length the Butler family history. She testified in some detail as to the preliminaries prior to the transfer of the property on December 2, 1929. She and Hubert were visiting with Hubert's father and mother in Des Moines at Thanksgiving time, which was about one week prior to the transfer.

The record discloses the following questions and answers:

"Q. What did mother Butler say? A. Mother Butler told us that they were deeding the property to Robert S. Butler. * * * And that he was to hold the property and we were to receive each month one third of the income of the Butler Building in Chicago. We were also to receive one third of the proceeds of the Clark Street property when sold; also one third of the Brownsville property when sold. She also stated that in this

agreement that Edith Butler had signed it so that she would understand that the property did not belong to Rob entirely.

"* * * Q. Was there any conversation about what would happen in the event that Rob should pass away? A. Hubert asked his mother what provision was made in the event if Robert would die, and she told us that the heirs were bound to carry out this agreement.

"* * * Q. Did either of you ask Sarah Butler to see the agreement? A. We did not ask Sarah Butler to see any such agreement, however, I spoke to Hubert, and he said he wouldn't want to ask his mother to see it because it would hurt her feelings."

Margaret testified at length with reference to the action in Illinois. She said that after the death of Sarah Butler in 1940, Robert ceased sending any checks to Hubert. In 1942 they filed action against Robert and the Butler Building Inc., in Chicago. Robert appeared in the action, but before it was tried a settlement was made. The settlement was that Robert made a cash payment of $16,500, which paid the $4000 attorney fees for his attorneys, and $12,500 for him. Robert paid for three single payment annuity policies. The total cost of the policies was $54,538.44, and the provisions of the policies were that Hubert should have $500 a month annuity during all the remainder of his life. He only lived sixteen months.

In connection with the settlement of the action she testified that she and Hubert signed a complete release as to any claims against Robert. In accordance with the agreement, their attorneys signed a dismissal of the case with prejudice. Because of their importance we will show the settlement agreement, dismissal with prejudice, and court order, infra, in our discussion of Margaret's case.

Robert Sheldon Butler was called on behalf of both plaintiffs and defendants. He testified he was one of the trustees of the R. S. Butler Trust and the Mable Janes Property Trust, and that he now had charge of the property. His testimony was largely confined to the fact that on July 9, 1953, a law firm in Des Moines by the name of Dykstra & Brown issued an opinion to his father stating in substance that the agreement of May 18, 1932, was void as being barred by the statute of limitations.

He also testified as to the assets in the R. S. Butler Trust on July 8, 1952, when it was established. He stated the assets were $2,306,124.16. Against said item there were certain liabilities and reserves amounting to $411,784.79, leaving the net book value of the assets at the difference between the two figures.

William Dillon testified he was the attorney for Hubert and Margaret Butler in their action in Illinois against Robert S. Butler. He had been a practicing attorney in Chicago for 47 years. He testified that before the commencement of the action in Chicago he had approved a trip by Hubert to Des Moines to see if he could make any adjustment with Robert. According to Hubert's report to him when he returned from Des Moines, Hubert went to Robert's office and was waiting there when Robert came in. Robert said to Hubert: " 'How do you happen to be in Des Moines'?" Hubert then said: " 'I wanted to talk to you about our father's estate.' " Robert then said to him: " 'There is nothing whatsoever for us to talk about.' " The attempt at that time to make an adjustment failed.

He then discussed the details of the case somewhat and the matter of final settlement which he largely arranged with Robert's attorney.

He was asked as to whether or not if he had known at that time about the written statement given by Robert to Earle on December 2, 1929, and the written agreement entered into between Robert and Earle on May 18, 1932, he would have recommended the settlement which was made. His answer was that he would not have recommended such settlement.

Albert A. Augustine was the accountant for plaintiff. His testimony was very lengthy. Since this is not an accounting action between the parties most of the testimony is not material in this action and the attorneys on both sides recognized such fact. However, there was material evidence in that he testified when the property of Eugene K. Butler was deeded and transferred to Robert S. Butler on December 2, 1929, Robert established a separate set of books as to the property. The books established were known as Robert S. Butler Special Account. From 1929 to 1946 all records as to the Eugene K. Butler property were kept in these separate books. A separate bank account was established with reference to all moneys that came

in or were paid out as to the Eugene K. Butler properties in the Des Moines National Bank. In other words, during such years the Eugene K. Butler property and all receipts and disbursements pertaining to same were completely segregated unto themselves.

Starting with 1946, said property and such accounts were gradually moved into a set of books and an account known as Robert S. Butler Company account. One question asked of Mr. Augustine, and his answer, illustrates this situation.

"Q. From 1930 through 1946 do those books appear to have been kept as though they recorded the transactions of a business entity? A. Yes, they appear to be the records kept for a separate business entity."

Col. Oliver P. Bennett testified he was associated with Mr. Dillon in the action of Hubert and Margaret Butler against Robert S. Butler in Chicago. Apparently Mr. Dillon had asked him to contact Robert Spring Butler and Edward Earle Butler concerning the case. He did contact them but received no information concerning Hubert's claim or the property held by Robert. He also discussed the fact that the case was settled and release signed by Hubert and Margaret and that his fee was paid.

He testified that if he had known about Exhibit 52 at the time the case was settled he would not have recommended settlement.

John C. Butler, son of Robert, was called. He lives at Glencoe, Illinois, near Chicago. He identified the R. S. Butler Trust Agreement, identifying his signature as a cotrustee. He identified his signature as a trustee in the Janes Property Trust. He stated he was practicing law in Chicago and was not active as a cotrustee, leaving matters largely to his brother Robert Sheldon Butler who lived in Des Moines and had the management of the property in the trusts.

Margaret B. Grieve testified she was the daughter of Robert Spring Butler and lived in Elm Grove, Wisconsin. She testified her father died in a hospital in Milwaukee on October 25, 1956. She also testified that she was a cotrustee now in the R. S. Butler Trust and the Mable Janes Trust.

Mrs. Edith Butler, the widow of Robert Spring Butler, testified she did not know anything about the transfers of prop-

erty to her husband on December 2, 1929, until after his death. She did not know about the agreement of May 18, 1932, until after her husband's death. She said she heard Margaret testify that Mrs. Sarah Butler said she signed an agreement in 1929. The questions and answers were as follows:

"Q. Did you ever sign such an agreement as that? A. I don't remember doing anything like that.

"Q. So far as you know, you never did sign any such agreement? A. As far as I remember, I did not, no."

Defendants called the following witnesses; again we will briefly give the substance of their evidence:

Mr. C. Daggett Harvey is now vice-chairman of the family enterprise of Fred Harvey Restaurants. However, he studied law and graduated from Northwestern University Law School in 1933. He worked eight years for the Chicago law firm of Sidley, Austin, Burgess & Smith. Mr. Edwin C. Austin was the attorney for Robert S. Butler in the action in Chicago when Hubert and Margaret sued Robert and Butler Building Inc., an Illinois corporation. In connection with the preparation of the defense Mr. Austin sent Mr. Harvey to Des Moines to interview Robert and Earle concerning the defense of the action.

He made notes as to their statements and after he returned to Chicago he dictated the statements made by the two brothers.

In connection with Earle's statements there are a few inconsistencies. He made some statements that could be interpreted to mean that the property belonged to Robert. However, he made other statements which indicated the existence of a trust.

Mr. Harvey quoted Earle as saying concerning his father: "Hubert was out of the picture and his father was cutting up what was left." Mr. Harvey also quoted Earle as saying: The first Earle knew of Hubert's claim that he was entitled to a share in the gift was in 1940 when he came to Des Moines and started snooping around for information. Robert told him about this later.

A Des Moines lawyer asked Earle for information about his father's gifts to Robert. Earle told him it was none of his business and gave him no information.

Morris C. Radnich was an auditor for the Iowa-Des Moines National Bank. He was familiar with the safe-deposit box department. Earle had testified that he went to the bank and secured the document Robert gave him on December 2, 1929, and took it to the office in the K. P. building. When Exhibit 52 was signed by Robert and Earle the December 2, 1929, document was destroyed and he took Exhibit 52 back to the bank and placed it in his safe-deposit box. The inference was that he had made both trips to his safe-deposit box on the same day. Mr. Radnich testified that Earle had not been to the bank twice on May 18. Appellees placed great stress on this rather insignificant occurrence. However, Mr. Radnich did testify that Earle had checked into his safe-deposit box on May 18 and again on May 20. This occurrence was over 25 years ago so that it is possible that Earle's memory concerning the exact time of securing and depositing the two documents was somewhat faded. It could easily be that he took out the first document on May 18 and deposited Exhibit 52 on May 20.

Mr. Marvin Selden was the public accountant who had made examination of the Butler books on behalf of defendants. As far as the substance of his evidence as to the books was concerned it differed very little from the testimony of Mr. Augustine, plaintiffs' accountant. He supported Mr. Augustine on the proposition that after Robert took over all the property on December 2, 1929, he maintained a separate set of books for such property. He testified Robert maintained the books in said form from 1929 until 1946, when the R. S. Butler Special Account was closed out, and on January 1, 1947, it was consolidated with the books known as Robert S. Butler Company books.

Mr. Selden testified at length concerning Robert's income tax returns and his gift tax returns. He stated that starting with the year 1930 Robert filed income tax returns in his own name covering the income tax from all his own property and the R. S. Butler Special Account property, although part of the tax was paid from R. S. Butler Special Account. He also testified that through the years from 1930 to 1940 Robert filed a gift tax return as to the money he sent to Hubert. He filed as a donor and each year Hubert signed a form as to such money paid to him as the donee.

It should be observed at this point that Robert never filed any gift tax return as to his father and mother during the years from 1930 to 1940, when his mother died.

Dr. F. D. Staves was called as a witness for defendant. He had been a tenant in the K. P. building for twenty or thirty years. He knew both Robert and Earle and saw them almost daily. The substance of his testimony was that Robert worked almost continuously from nine o'clock in the morning until five o'clock in the afternoon. Earle had an office and generally was in his office, but there were many occasions when apparently he was out of town and was not in his office.

Edwin C. Austin was the attorney for the Butler family in connection with several legal matters in Chicago. He testified he had many contacts with Hubert during the depression years. There were several years when the lessee under the 99-year lease of the Butler Building ground could not pay his rent. Under the lease he was also obligated to pay the taxes and he became in arrears on the taxes. Mr. Austin represented the family in the matter of bringing the rent up-to-date and in the matter of getting the lessee to bring the taxes up-to-date.

Mr. Austin also represented the family in an inheritance tax action which had been filed in connection with the transfer of the property by Eugene K. and Sarah Butler to Robert Butler in December of 1929. The question was whether a bona fide outright gift had been made to Robert and whether such gift was not made in contemplation of death. If it was made to the family, although in Robert's name, or in contemplation of death, the Illinois property would be subject to tax. This property was the Butler Building ground which was later sold for $600,000 and the Clark Street property which was later sold for $69,000.

Mr. Austin testified about the following affidavits being sent forward to him in connection with the hearing:

1. Affidavit of Dr. Addison C. Page which showed that Mr. Eugene K. Butler was mentally alert on December 2, 1929.

2. Affidavit of Sarah R. Butler to the effect that the property was transferred to Robert without any limitations.

3. Affidavit of Clinton L. Nourse, the attorney, who had prepared the deeds as to the real estate and the assignment of the personal property. We will quote the portion of Mr. Nourse's

affidavit after he had described the real and personal property. It is a masterpiece of noncommittal, and reads as follows:

"That there was no conversation at said time and place, in or leading up to the making of said conveyances of real and personal property, by any of the said persons present, in regard to conveying any property to the eldest son of Eugene K. Butler and Sarah R. Butler, Hubert Wilson Butler, of Chicago, Illinois, nor was there any conversation in regard to conveying any property to the youngest son of Eugene K. Butler and Sarah R. Butler, E. Earle Butler, of Des Moines, Iowa, nor was there at that time any suggestion made by Robert Spring Butler, nor at any other time, in my presence, that the said real estate and personal property above described or any part of it, should be conveyed to him, the said Robert Spring Butler, nor any solicitation by him or by anybody else in regard thereto, that said conveyances should be made, but said conveyances were made wholly at the direction and upon the request of the said Eugene K. Butler and Sarah R. Butler."

Mr. Nourse does not say the property was a gift to Robert; nor does he say a trust was established. As good a lawyer as Mr. Nourse knew the facts. He wanted to help the family in their case. It is significant he did not come right out and say the property was a gift to Robert.

Mr. Austin testified concerning the Illinois action by Hubert and Margaret against Robert which has heretofore been outlined in connection with Mr. Dillon's testimony.

The last witness called by defendants was Walter Brown, a practicing attorney in Des Moines and a member of the firm of Dykstra & Brown. Mr. Brown's testimony consisted altogether of presenting and explaining the opinion dated July 9, 1953, rendered by said firm, concerning the agreement of May 18, 1932, between Robert and Earle. It was the opinion of said firm that said agreement was unenforceable and that it was barred by the statute of limitations.

Plaintiffs called three witnesses for rebuttal evidence. Their evidence pertained to only one question and was similar as to all three witnesses. They were Forrest Nelson Williams, an officer of The First National Bank of Chicago; Thomas H. Beacom, a vice-president of First National Bank of Chicago

and Clyde H. Doolittle, an officer of the Iowa-Des Moines National Bank of Des Moines. Mr. Williams testified that Edward Earle Butler consulted him on August 29, 1946. Mr. Beacom testified Earle consulted him on March 5, 1941. Mr. Doolittle also testified that Mr. Butler consulted him in 1941. The matter concerning which Earle consulted all of these gentlemen was in connection with estate planning. In the course of the discussion these three witnesses testified Earle told them he had a one-third interest in the Butler Building and other property, which had been placed in trust with his brother Robert. This is, of course, a self-serving declaration, but it does show the feeling and position of Earle through the years as to complete dependence on the provisions of the agreement, Exhibit 52.

Appellees' counsel take the position with reference to the testimony of Earle and Margaret that it should not be accepted on the theory of falsus in uno, falsus in omnibus. Both witnesses had some inconsistencies in their evidence, although Margaret's was slight. The inconsistencies did not seriously affect the real issues in the case.

The difficulty was the Butler family had become obsessed with the idea that much of the Butler fortune of about a million dollars might be lost.

They were fearful that Hubert's creditors would take his normal one third. They were also afraid that between Illinois inheritance tax and possible Federal estate tax a large part of the balance would be lost.

So Mr. and Mrs. Eugene K. Butler deeded the real estate, and transferred all the personal property, to Robert.

When it happened on December 2, 1929, Robert had no thought of keeping it all for himself. The general feeling in the family circle was exactly as Mrs. Sarah Butler told Earle, Hubert and Margaret, all as heretofore stated.

As stated by Sarah, Robert was expected to properly take care of his parents, as he did. Also as she said for ten years he paid Hubert and Margaret a monthly allowance, first $833.33 per month, and later $500 per month. On December 2, 1929, he gave Earle written memoranda to protect him. Later he executed the agreement, Exhibit 52, for Earle's complete protection.

As the years passed by the threat of Hubert's creditors

disappeared. Through misrepresentation by Robert he succeeded in defeating the Illinois Tax Commission claim as to taxes on the Illinois property. This was the property that sold later for $669,000. At the hearing Robert testified:

"Q. Who retained the income from the property? A. I did.

"Q. In its entirety? A. Yes sir.

"Q. Did you distribute any portion of that income to any other members of the family? A. No sir.

"Q. Or at no time since your father's death? A. No sir.

"Q. Was there any objection made by any member of the family that the transfer, in its entirety, was made to you? A. Not to my knowledge."

This was completely erroneous. At that time he had paid his parents $18,900.83, and Hubert and Margaret $38,282.34 out of R. S. Butler Special Account. The obsession was so strong within the family circle, that in the Illinois inheritance case they even had dear old mother Sarah Butler sign an affidavit that the property belonged to Robert, with no strings attached. This was not true; it was completely contrary to what Mrs. Sarah Butler had told Earle, Hubert and Margaret.

Even Earle was a part of the family obsession. He did not come out too strong, but he at least implied to Mr. Harvey in his interview, that Robert was the owner of the property in connection with Hubert's and Margaret's case against Robert in Illinois.

Robert had been carrying on the fiction as strongly as the others.

After about 20 years the situation had advanced to the point where Robert had convinced himself that he and his family should keep the property. He salved his conscience by securing legal opinions from his lawyer son John, and another opinion from Dykstra & Brown. It should be said to the credit of these lawyers, they had only Exhibit 52 for interpretation. Apparently none of them was told about the December 2, 1929, document, nor the circumstances supporting the theory of trust. We have the opportunity to contemplate the complete picture, which they did not have. At no time during his lifetime did Robert disclose to his brother Earle that he intended to keep the property.

III. We will first consider the case and claim of Margaret Butler. The principal contention of appellees with reference to her case is that the case filed and settled by her and her husband, Hubert, in Illinois in 1942 is res judicata as to the case at bar.

■ A general definition as to res judicata, broadly stated, appears in 30 Am. Jur., Judgments, section 161, as follows: "[Briefly stated], the doctrine of res judicata * * * is that an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions, and facts in issue, as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction."

There are a multitude of cases with reference to the doctrine of res judicata. We will only cite a few recent cases. State ex rel. Howson v. Consolidated Sch. Dist., 245 Iowa 1244, 65 N.W.2d 168; In re Estate of Richardson, 250 Iowa 275, 93 N.W.2d 777; Phillips v. Cooper, 253 Iowa 359, 112 N.W.2d 317; City of Chariton v. J. C. Blunk Construction Co., 253 Iowa 805, 112 N.W.2d 829.

The first question is whether the parties or their privies are the same. In the Illinois case Hubert and Margaret Butler sued Robert S. Butler. In the case at bar Margaret Butler, sole beneficiary under the will of Hubert Butler, deceased, sued the estate and trustees of Robert S. Butler, now deceased. The parties are the same or in privity.

The petitions, and prayers, in the Illinois case and the case at bar are substantially the same; the issues are therefore the same.

■ Rules of res judicata are particularly applicable to courts of the same jurisdiction. The Full Faith and Credit clause of the United States Constitution, Article IV, section 1, requires that like effect in that respect be given to judgments of other states. The section provides: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State * * *." Bowen v. Bowen, 219 Iowa 550, 258 N.W. 882; McKee v. McKee, 239 Iowa 1093, 32 N.W.2d 379; Williams v. North Carolina, 325 U. S. 226, 65 S. Ct. 1092, 89 L. Ed. 1577, 157 A. L. R. 1366.

The Illinois case was settled. The matter is so important with reference to Margaret's claim in the instant case that we quote the agreement made between Hubert and Margaret Butler as first parties, and Robert S. Butler as second party:

"THIS AGREEMENT, made this 17th day of April, A. D., 1942, by and between HUBERT W. BUTLER, and MARGARET BUTLER, his wife, of Highland Park, Illinois (herein sometimes called 'Claimants'), and ROBERT S. BUTLER, of Des Moines, Iowa (herein sometimes called the 'Defendant'), WITNESSETH: That

"1. Claimants are plaintiffs in a suit now pending against Defendant, being Number 3306, in the United States District Court for the Northern District of Illinois, in which suit by their Complaint, Claimants allege that certain transfers to Defendant of real estate and personal property made during his life by Eugene K. Butler (father of Claimant Hubert W. Butler and of Defendant) now deceased,

"(a) were invalid because of the mental incapacity of Eugene K. Butler, or

"(b) if valid, said transfers were made by Eugene K. Butler upon trusts in favor of the Claimants as in their Complaint set forth;

"2. Defendant has answered in said suit denying the invalidity of said transfers; asserting that they effected absolute gifts to Defendant; and claiming absolute ownership of all of said real estate, money, and personal property, free from any and all trusts.

"3. Both before and since the filing of the court proceedings, the Claimants and Defendant have carried on extended negotiations, through their counsel, looking toward a possible settlement of the claims; and since the filing of the court proceedings, a substantial amount of information has been exchanged between counsel, and has been developed from interviews with prospective witnesses, bearing upon the position of each party.

"4. As the result of these negotiations and exchanges of information occurring since the filing of the suit

"(a) Claimants have been convinced and now acknowledge that their claim, based upon the alleged mental in-

capacity of Eugene K. Butler was and is completely groundless and unfounded.

"(b) Claimants and Defendant have been convinced that

"(1) It was the desire of Eugene K. Butler, whether or not legally effective and binding upon Defendant, that Defendant should pay to or expend for Claimant Hubert W. Butler, during his life, such sum as (Defendant in his sole and absolute discretion) might deem necessary for the maintenance and support of such Claimant, without right of alienation, assignment, anticipation or encumbrance by Hubert W. Butler;

"(2) A decision that the transfers above described were made upon trust that Defendant should so pay or expend, would be the most favorable which claimants could anticipate.

"(3) It is possible although not certain that Claimants might procure such a decision if the litigation were continued.

"(c) Defendant is unwilling to make any settlement unless on a basis which is consistent with the above mentioned desire of Eugene K. Butler.

"5. In order to avoid further litigation, claimants and defendant have agreed upon a settlement of all matters at issue between them. Pursuant thereto, Defendant has taken all action and made all payments required or intended to be taken or made on his part, to fully consummate said settlement. Said action includes (a) the making of certain payments of money to Claimants jointly; (b) purchase of certain annuity policies providing for annuities to be paid by the issuers of said policies to Claimant Hubert W. Butler; and (c) payment to Messrs. Concannon & Dillon and Oliver P. Bennett, counsel for Claimants, of certain sums in full settlement of fees for the professional services rendered by them to Claimants.

"6. Claimants have delivered to Defendant

"(a) Instruments of full release of all claims against Defendant, executed by Claimants and by Messrs. Concannon & Dillon and Rudolph E. Bostleman, a former member of said firm, and Oliver P. Bennett.

"(b) Quitclaim deeds with respect to the parcels of real estate described in the Complaint in said suit.

"(c) Irrevocable stipulation to dismiss the suit above mentioned.

"7. Claimants further covenant and agree with Defendant to deliver to Defendant hereafter any and all such further instruments and documents of whatsoever character as may be required by Defendant or his successors to evidence the full release by Claimants of all claims against Defendant and of all interest of whatsoever character in any property now or hereafter owned by Defendant, or by anyone claiming by, through, or under him, including without limitation of the foregoing, the parcels above mentioned.

"WITNESS the hands and seals of the parties hereto this 17th day of April, 1942.

"(s) Hubert W. Butler

"(s) Margaret S. Butler
 Claimants

"(s) Robert S. Butler
 Defendant."

In accordance with such stipulation and agreement the case was duly dismissed by the attorneys for Hubert and Margaret:

"STIPULATION TO DISMISS

"It is hereby irrevocably stipulated and agreed by and between the parties hereto that this cause may be dismissed with prejudice to the rights of the plaintiffs to reinstate said cause, and without costs, all costs having been paid.

"Dated April 17, 1942.

 "(s) Concannon, Dillon, Snook & Arthur
 Attorneys for Plaintiffs

 "(s) Sidley, McPherson, Austin & Bunyan
 Attorneys for Defendant, Robert S. Butler

"(s) Peabody, Westbrook, Watson & Stephenson
Attorneys for Defendant, Butler Building
Inc., a corporation."

In accordance with the stipulation of settlement and dismissal the United States District Judge on October 19, 1942, entered the following order: "On stipulation cause dismissed with prejudice and without costs. Igoe"

The next matter to consider is whether the dismissal of a case with prejudice based on a settlement agreement has the same force and effect as to res judicata as a trial of a case and the decision of a court after trial. The question has been decided in many decisions, and has been considered in American Jurisprudence; Burns v. Fincke, 90 U. S. App. D. C. 381, 197 F.2d 165; Cleveland v. Higgins, 2 Cir., 148 F.2d 722; United States v. Parker, 120 U. S. 89, 93, 7 S. Ct. 454, 30 L. Ed. 601; American Trading & Storage Co. v. Gottstein, 123 Iowa 267, 98 N.W. 770, 101 Am. St. Rep. 319; In re Estate of Ramsay, 240 Iowa 50, 35 N.W.2d 651; Lawlor v. National Screen Service Corp., 3 Cir., 211 F.2d 934; Conner v. Cornell, 10 Cir., 32 F.2d 581; People v. Sterling, 357 Ill. 354, 192 N.E. 229; 17 Am. Jur. 176, Dismissal, section 106; Hancock National Bank v. Farnum, 176 U. S. 640, 20 S. Ct. 506, 44 L. Ed. 619; City of Chariton v. J. C. Blunk Construction Co., supra.

This court has spoken on the subject in the very recent case of City of Chariton v. J. C. Blunk Construction Co., supra, at page 813 of 253 Iowa:

"Nor are we prepared to agree that a consent judgment is not an adjudication against the parties. We quote from 30A Am. Jur., Judgments, section 150, pages 256, 257: 'And notwithstanding flat statements to the contrary in some of the cases, which, however, in their actual holdings fail to bear out these statements, it is well settled, as a general proposition, that a judgment or decree, though entered by consent or agreement of the parties, is res judicata to the same extent as if entered after contest.'

"Freeman on Judgments (Fifth Ed.) Volume 3, section 1350, says: 'Such a judgment has substantially the same effect as any other judgment rendered in ordinary course, and is

entitled to the same presumptions. As we have elsewhere seen, *it is equally conclusive as to matters adjudicated,* is not subject to collateral attack except upon jurisdictional grounds, and is entitled to full faith and credit in a sister state.' (Italics supplied.)

"The plaintiff cannot avoid the bar of adjudication by claiming the first judgment was by consent."

In Burns v. Fincke, supra, plaintiff brought suit alleging breach of contract and defendant counterclaimed. The parties then entered into a stipulation of dismissal in which the plaintiff directed the Clerk of Court to dismiss with prejudice his complaint, and the defendant directed the Clerk of Court to dismiss with prejudice his counterclaim. Afterwards plaintiff filed a second action and defendant asserted that the prior action was res judicata. The court said at page 166 of 197 F.2d: "\* \* \* Since the stipulation provides for dismissal with prejudice, the first action is res judicata of the matters covered by the cause of action and counterclaim therein. \* \* \* The item of $14,000 for which the present action was instituted was a part of the disputed matters included in the compromise agreement of November 24, 1947. It was merged in the action on that agreement. When that action was dismissed with prejudice, res judicata which attached to its subject matter attached to its component parts."

In the case of American Trading & Storage Co. v. Gottstein, supra, 123 Iowa 267, the facts concerned an attempt to enforce in an Iowa court a judgment and decree obtained in an Illinois court. The defendant, Gottstein, sought to avoid a personal judgment entered against him in an Illinois court, alleging that in the Illinois action there was a first complaint which did not seek a personal judgment, and a final decree was entered on the first complaint, and that thereafter the Illinois court was without jurisdiction to render a subsequent decree wherein personal judgment was entered; the Iowa Supreme Court turned to the law of Illinois and that if the decree of the Illinois court was rendered in accordance with the normal usage and practice in Illinois courts, the decree was binding in a sister state of Iowa.

"Where a judgment dismissing an action 'with prejudice' is rendered upon a stipulation of the parties, it operates as a

bar to another action upon the same cause. In re Ramsay's estate, supra."

Ever since the decision of Justice Cardozo in United States v. Swift & Co., 286 U. S. 106, 114, 52 S. Ct. 460, 76 L. Ed. 999, there has been no question in the federal courts but that a consent decree is an adjudication. The court said: "The result is * * * whether the decree has been entered after litigation or by consent. * * * We reject the argument for the intervenors that a decree entered upon consent is to be treated as a contract and not as a judicial act."

In Lawlor v. National Screen Service Corp., supra, the court said on page 935 of 211 F.2d: "* * * It should be noted at the outset that our problem here is not affected by the fact that the dismissal of the 1942 action was by stipulation instead of the result of a trial on the facts and the law. A consent judgment or, like the one present, one which is a 'dismissal with prejudice' has the same effect as a bar as if the case had gone to trial and the judgment rendered thereafter."

It is, of course, true that the 1943 judgment dismissing the previous suit "with prejudice" bars a later suit on the same cause of action.

The Illinois courts have in general supported the same proposition. In O'Connell v. Chicago Terminal Transfer R. Co., 184 Ill. 308, 325, 56 N.E. 355, 361, the court stated: "It makes no difference whether the decree in the Martin case [Martin v. People, 23 Ill. 342] was a consent decree or not. Even if entered by consent of the village, it is binding upon those who are in privity with the village."

▮ The case of Hubert and Margaret in the United States District Court for the Northern District of Illinois is clearly res judicata as to the cause of action and claim in the estate of Robert S. Butler in the case at bar.

In this case Margaret alleges res judicata is not effective because Robert was guilty of fraud in connection with the Illinois case in that he failed to tell Hubert and Margaret about the written documents of December 2, 1929, and May 18, 1932.

▮ Both parties engage in lengthy discussion as to fraud in connection with a decree and as to the fact that in order to vitiate a decree the fraud must be external fraud and not in-

ternal fraud. We have supported this theory of law in many cases. Mahoney v. State Insurance Co., 133 Iowa 570, 110 N.W. 1041, 9 L. R. A., N. S., 490; Edgerly v. Sherman, 252 Iowa 352, 107 N.W.2d 72; Scheel v. Superior Mfg. Co., 249 Iowa 873, 89 N.W.2d 377; Reimers v. McElree, 238 Iowa 791, 28 N.W.2d 569.

■ This theory of law and this discussion do not apply to the case at bar. In order to constitute fraud against Margaret, the silence of Robert must have been prejudicial to her. It was not prejudicial to her because she knew about the writing of December 2, 1929, from her conversation with Sarah Butler a week before the transfer. See conversation between Hubert, Margaret and Sarah as shown in Division II. There was no prejudice to her as to the agreement of May 18, 1932, because neither she nor Hubert was mentioned in the agreement. Margaret's counsel drew implications from the agreement, but implications do not establish trusts.

IV. We will now consider the action and claim of Edward Earle Butler. Some general and often repeated pronouncements as to "trusts" should first be considered.

■ Neither a statement by the settlor, nor a formal written declaration is essential to establish a trust. The facts and circumstances surrounding the transaction, statement of intentions by one of settlors, conduct and actions of the parties, especially the donee, written statements of Robert of December 2, 1929, and May 18, 1932, all taken together establish the existence of a trust relationship. Hardy v. Daum, 219 Iowa 982, 259 N.W. 561; Neilly v. Hennessey, 208 Iowa 1338, 220 N.W. 47; Pap v. Pap, 247 Iowa 371, 73 N.W.2d 742; Heiden v. Cremin, 8 Cir., 66 F.2d 943, 91 A. L. R. 247; Wyse v. Puchner, 260 Wis. 365, 51 N.W.2d 38; Jaiser v. Milligan (U. S. D. C. Neb.) 120 F. Supp. 599; Restatement of Trusts 2d, Volume 1, section 24.

In Wyse v. Puchner, 260 Wis. 365, 370, 51 N.W.2d 38, 41, the court, relying upon letters written by decedent to her attorney and to the plaintiff, concluded decedent held certain money in trust for plaintiff, and stated:

■ "In the case of In re Brown's Will, 1930, 252 N.Y. 366, 375, 169 N.E. 612, 614, it was said: 'While a transfer of the property to a trustee for the purposes of the settlement may be

the surest way to create a trust, yet the same result will be accomplished if the owner declare that he himself holds the property in trust for the person designated, and this trust may be created either in writing or, if relating to personal property, by parol. The declaration need not be made to the beneficiary, nor the writing given to him; in fact, his ignorance of the trust is immaterial. * * *' That this doctrine has generally been followed appears from the following cases and authorities: Martin v. Funk (1878), 75 N.Y. 134, 138; Ulmer v. Fulton (1935), 129 Ohio St. 323, 195 N.E. 557, 97 A. L. R. 1170; Faulds v. Dillon (1925), 231 Mich. 509, 204 N.W. 733; 1 Perry, Trusts and Trustees (7th ed.), p. 112, sec. 96; 65 C. J., Trusts, p. 278, section 61.

" 'Whether a trust has been perfectly created is largely a question of fact in each case, and the court in determining the fact will give efficacy to the situation and relation of the parties, the nature and situation of the property, and the purposes and objects which the settlor had in view.' Perry on Trusts and Trustees, 7th ed., vol. 1, p. 124."

In McDiarmid v. McDiarmid, 368 Ill. 638, 642, 15 N.E.2d 493, 495, the court said: "In support of their contention that they have proved an express trust appellees rely on our holdings in *Kingsbury v. Burnside*, 58 Ill. 310 [11 Am. Rep. 67], and many other decisions, including Whetsler v. Sprague [224 Ill. 461, 79 N.E. 667], supra. These decisions hold that the Statute of Frauds has been complied with if the trustee makes a memorandum or writing showing that the property is held in trust. *The details and terms of the trust may be established aliunde and even by parol evidence.* Thus, it is held, after an exhaustive review of the authorities in the *Kingsbury case,* that in order to establish an express trust and to meet the requirements of the Statute of Frauds it is not necessary that it be established by a formal declaration of the trust but it is sufficient if it be proved by letters or other memoranda. The writing need not be an instrument expressly framed for the purpose of acknowledging the trust. *It is sufficient if the recognition or admission of the trust be incidentally made in the course of correspondence, and almost any memorandum will suffice.* The letter or memorandum need not be addressed to the cestui que trust and may be written after title has been acquired by the trustee. The letters contained in the record

before us satisfy the requirements of the statute and are supported by the receipts, many of which were also written by John R. McDiarmid, and show that he was paying his brothers and sisters their part of the proceeds of the sale of the land, title to which he held for them. He again wrote that it would be necessary to hold the land for a better price after Fogarty had surrendered possession." (Emphasis supplied.)

In Holmes v. Holmes, 65 Wash. 572, 574, 118 P. 733, 734, the court said: "* * * The important and decisive question in the case is, can an express trust be proven by a writing signed by the trustee? We think the question must receive an affirmative answer. In volume 3, Pomeroy's Eq. Jur. (3d Ed.), Section 1007, this view is announced in the following language: 'The written evidence of the trust which will satisfy the statute *may* come from the grantor (the one who intends that a trust shall be created for a certain beneficiary) or from the trustee (the grantee to whom the land is conveyed for the purposes of the trust), but not from the *cestui que trust.* * * * When the trust is not created in and by the instrument of conveyance, it may be sufficiently declared and evidenced by the trustee to whom the land is conveyed, or who becomes holder of the legal title; and this may be done by a writing executed simultaneously with or subsequent to the conveyance, and such writing may be of a most informal nature.' "

1 Restatement of the Law, of Trusts 2d, section 24, provides:
"Mode of Manifestation of Intention

"(1) Except as otherwise provided by statute, the manifestation of intention to create a trust may be made by written or spoken words or by conduct.

"(2) No particular form of words or conduct is necessary for the manifestation of intention to create a trust."

In paragraph "b" of the comments to section 24 it is stated:

"Acts prior to and subsequent to, as well as acts contemporaneous with the manifestation which it is claimed creates a trust, may be relevant in determining the settlor's intention to create a trust."

We hold the real estate deeded and the personal property assigned by Eugene K. Butler and his wife Sarah to Robert S. Butler on December 2, 1929, was held by Robert in trust for

Hubert, Earle and Robert, and their parents Eugene K. and Sarah Butler.

In 1929 Sarah was the vigorous and dominant person as to the transfer of the property. The record clearly discloses she spoke and wrote for herself and her husband.

The written or oral statements, circumstances and actions establishing such trust relationship are as follows:

■ 1. Evidence of Margaret Butler as to statements of Sarah Butler, one of the settlors, to her and her husband, Hubert, about a week before the deeding and transfer of the property to Robert, which evidence appears, supra. This evidence of Margaret's is admissible as to Earle's case.

2. The testimony of Earle prior to December 2, 1929, as to what his mother, Sarah, told him about the conditions under which the property was being transferred to Robert.

3. Earle testified Robert gave him a written statement creating a trust on December 2, 1929, when he received the property. Defendants deny the existence of such a document. This was their assumption. The passage of many years and the death of Robert and his parents made it impossible for defendants to present any direct contrary evidence. Earle had supporting evidence as to his contention. Margaret testified as outlined heretofore and referred to in the foregoing paragraph. As a matter of emphasis we repeat that Sarah said to Hubert and Margaret a written statement as to what Robert was to do was executed.

4. The written agreement between Robert and Earle of May 18, 1932. The trial court held this was an ordinary contract, was without consideration, and not binding on Robert nor his estate.

■ It is our position that this document was a ratification of the trust relationship. Because of the trust relationship no evidence of consideration between Earle and Robert was necessary. If it had been necessary to make the agreement legal, there was other consideration under the terms of the contract than love and affection.

5. The undisputed fact that Robert paid to his parents the sum of $52,258.59 from December 2, 1929, until their death .(Eugene in 1931 and Sarah in 1940), out of the property transferred to him, for their care and personal expenses. This con-

stituted a partial compliance with the original trust agreement.

6. The undisputed fact that Robert paid to Hubert the sum of $152,305.67, partly during the life of the parents, and finally in settlement of the Illinois case. This was partial performance of the trust.

7. The evidence by the accountants that Robert established a separate book account as to the Eugene K. Butler property. He also maintained a separate bank account as to the property. This separate book situation was maintained from 1929 to 1946, when Robert gradually transferred the property, or proceeds of any sales, into another account, personal in nature, known as R. S. Butler Company account. The book accounts were clearly identified by the accountants. The evidence was admissible.

8. In December 1930 Hubert apparently wrote to Robert asking for more money. Defendants were requested to produce the letter, but it had been destroyed or lost.

Robert's answer is in evidence. Margaret identified the letter, and Robert's signature. The letter dated December 10, 1930, said: "Frankly it is impossible to assist you in any way because of the fact that father's estate must keep what liquid securities there are intact to preserve it against all contingent liabilities, as for instance, the inheritance tax, etc." Robert does not claim he owns the property. He still tells Hubert the property was in the Eugene K. Butler estate. This was evidence of the existence of a Eugene K. Butler property trust.

9. When the property was transferred to Robert on December 2, 1929, he owed Earle $5000; December 14, 1929, he borrowed $4000 more. In 1930 he borrowed another $2500, so that at the end of 1930 Robert's books reflected that he owed Earle $11,500. Sometime later he paid it. Such borrowings by Robert are a contradiction of the claims of defendants herein that the more than $500,000 in personal property transferred to him on December 2, 1929, was a gift to him. If the money was his, why should he borrow from Earle?

10. Between 1929 and 1946 the R. S. Butler special account books (as to Eugene K. Butler property) disclose that Robert at times advanced money to himself which he later repaid; another contradiction of absolute ownership of the property by Robert.

Starting with the agreement of May 18, 1932, ratifying the

written statement of Robert of December 2, 1929, and supported by the statements and circumstances outlined, supra, in our list of 1 to 10, plaintiff Earle established the trust in his favor to the extent of one third of the net property by clear, convincing and satisfactory evidence. Hardy v. Daum, 219 Iowa 982, 259 N.W. 561; Neilly v. Hennessey, 208 Iowa 1338, 220 N.W. 47; Ratigan v. Ratigan, 181 Iowa 860, 162 N.W. 580, 165 N.W. 85; Pap v. Pap, 247 Iowa 371, 73 N.W.2d 742; Herman v. Edington, 331 Mass. 310, 118 N.E.2d 865; Kintner v. Jones, 122 Ind. 148, 23 N.E. 701; Jaiser v. Milligan (U. S. D. C. Neb.) 120 F. Supp. 599; First National Bank of Ottawa v. Weise, 333 Ill. App. 1, 76 N.E.2d 538.

V. Many procedural and technical objections have been raised by appellees, requiring our consideration.

VI. Sarah Butler made statements to Hubert, Margaret and Earle concerning the plan, purposes and details of the transfer of the property on December 2, 1929. We have heretofore set them out verbatim. Earle also made a statement as to what Robert said to him about dividing the estate.

Appellees contend such statements are hearsay and not admissible. In the ordinary course of events the objection would be good.

There is a well established exception to the hearsay rule, where statements are made as to a design or plan. The case at bar is a perfect illustration of this exception. Wigmore on Evidence, Third Ed., Volume VI, section 1725, states:

"It has already been seen that the existence of a *design* or *plan to do* a specific act is relevant to show that the act was probably done as planned. The design or plan, being thus in its turn a fact to be proved, may be evidenced circumstantially by the person's conduct. But, as a condition of mind, the plan or design may also, it is clear, be evidenced under the present Exception by the *person's own statements* as to its existence. * * *

"But the principle has no narrow limitations; for example, when an *absence from the jurisdiction,* by a party or a witness, or the *making of a contract* or a *deed,* is to be evidenced by plan or design, the latter is then provable by the person's declarations." * * *

"To evidence that design or plan, the person's *statements of*

*his existing design or plan* are admissible, under the general principle of the present exception. These statements may be found in oral utterances, in letters, in the draft of a will or instructions to an attorney, or in any other form. The admissibility of such evidence, on the analysis just outlined, is entirely settled." (Emphasis ours.)

This theory is also supported in a statement in 31 C. J. S., Evidence, section 256:

"Declarations evincing a particular intent or intention are relevant in very many connections when the legal effect of an act or the animus with which it is done is to be determined; for example, to establish the intention with which goods, money, or negotiable instruments were received, or with which goods, written instruments, or money were delivered to another; to show on whose account money was delivered or received; to show purpose in taking possession of either real or personal property, or otherwise to qualify the act; to show intention as bearing on the abandonment of the ownership of property, the making of a gift, see * * * or advancement, or the delivery of a deed; * * *."

Krimlofski v. United States, 190 F. Supp. 734, 741, 746 (Judge Graven), involved the beneficiary in an insurance policy. Deceased designated his wife, mother and father as beneficiaries, in that order, without stating anything as to principal or contingent beneficiaries. Oral evidence was introduced as to statements of deceased as to his intention. Judge Graven quoted an illuminating statement from Wigmore as to the question, as follows:

" 'The truth had finally to be recognized that words *always* need interpretation; that the process of interpretation inherently and invariably means the ascertainment of the association between words and external objects; and that this makes inevitable a free resort to extrinsic matters for applying and enforcing the document. "Words must be translated into things and facts." * * * Perhaps the range of search need not be extensive, and perhaps the application of the document will be apparent at the first view; but there must always be a traveling out of the document, a comparison of its words with people and things. * * * the words of a document are never anything but indices to extrinsic things, and * * * therefore *all the circumstances must*

*be considered which go to make clear the sense of the words—* that is, their associations with things.' * * * [Emphasis ours.]

"It is the view of the Court that the testimony offered in the present case relating to statements made by the insured to the effect that he had made his wife the beneficiary of his National Service Life Insurance policy is admissible for the purpose of throwing light upon the question of his intent in regard to the application he filled out on September 27, 1951. They are not offered as evidence of a past act. The evidence of that act is before the Court in the form of the application in question. That application is ambiguous and therefore in its interpretation the intent of the insured becomes a material fact to be proved. Evidence of statements made subsequent to the act in question as to insured's understanding of the effect of the act is circumstantial evidence from which his intent at the time of the act may be inferred. See Moore v. United States, D. C. 1955, 129 F. Supp. 456, 458; VI Wigmore, Section 1736 at page 117 (3d ed. 1940)."

VII. Many of defendants' objections are based on the provisions of section 622.4, commonly known as "dead man's" statute. This claim is inevitable where about 30 years have passed since the establishment of the trust, and four out of the five persons directly involved have departed this life. We have passed on the question as we have reached most of the evidence. In reaching our evidence we have not taken into consideration any conversations of Margaret or Earle with Robert S. Butler, deceased.

In the few places where we have not heretofore passed on the question of violation of section 622.4, we do not consider there is any decisive testimony as to existence of a trust which is in violation of such statute.

 VIII. Defendants claim plaintiff Earle Butler's case and claim are barred by the statute of limitations, and by laches. We will consider them together. If not barred by the statute of limitations it logically follows that no question of laches is involved.

 Earle did not know Robert had repudiated the trust until after Robert's death in 1956. Earle approached Robert Sheldon Butler, the executor of the estate of his brother Robert,

and asked about division of the property transferred to Robert by their father on December 2, 1929. The executor told his Uncle Earle that no provision had been made in Robert's estate nor in the R. S. Butler Trust for any distribution, and that none would be made except by order of court.

Earle then retained attorneys and started this action and filed claim in the estate in 1957.

The statute did not commence to run until Earle was informed of the repudiation in 1956. Howes v. Sutton, 221 Iowa 1326, 1330, 268 N.W. 164, 166; Long v. Valleau, 87 Iowa 675, 55 N.W. 31, 34, 56 N.W. 748; 2 Perry on Trusts, p. 1468, section 863; Boehnke v. Roenfanz, 246 Iowa 240, 246, 67 N.W.2d 585, 590, 54 A. L. R.2d 1; Zunkel v. Colson, 109 Iowa 695, 698, 81 N.W. 175; Rorem v. Rorem, 244 Iowa 980, 989, 59 N.W.2d 210, 215; 34 Am. Jur., Limitation of Actions, sections 107 and 175; 53 C. J. S., Limitations of Actions, section 19(a); 54 C. J. S., Limitations of Actions, section 178.

In Howes v. Sutton, supra, the court said:

"Against an express and continuing trust, time does not run *until repudiation* or adverse possession by the trustee and knowledge thereof on the part of the cestui. This general principle is laid down in Long v. Valleau, 87 Iowa 675, 55 N.W. 31, 34, 56 N.W. 748. The court said in its opinion, page 684 of the report: [Emphasis ours.]

" 'The property in controversy, if not owned by the defendant, was held by her in trust. She was then, in law, a trustee holding property for the benefit of the real owner, Frank Teabout, and after his death she would hold it in trust for his estate. Now, the general rule is that the possession of property by the trustee, which is subject to the trust, is, in law, the possession of the cestui que trust.' "

In Boehnke v. Roenfanz, supra, the court stated: "It is elementary that as between the trustee and cestui que trust of an express trust, statutes of limitations have no application. Possession by the trustee of trust property is, in law, possession of the cestui que trust. As against an express and continuing trust, time does not run until repudiation or adverse possession by the trustee and knowledge or notice thereof to the cestui."

The defense of laches is an equitable defense. It

arises only when there has been an unreasonable delay in asserting an equitable remedy.

In 30 C. J. S., Equity, sections 112 and 115, the following is stated: "Laches in a general sense is the neglect, for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done. More specifically, it is inexcusable delay in asserting a right; * * *."

Section 115 states: "Since laches is an equitable doctrine, its application is controlled by equitable considerations. It cannot be invoked to defeat justice; and it will be applied only where the enforcement of the right asserted would work injustice."

19 Am. Jur., Equity, section 504, states: "If the complainant had no knowledge of the facts giving rise to the cause of action, he cannot be charged with laches. The complainant is not to be deemed to have been in default until there was something to apprise him of the defendant's hostile conduct or invasion of his rights and until he has had an opportunity to institute suit."

90 C. J. S., Trusts, section 456(b) states: "* * * The doctrine of laches applies to the enforcement of an express trust when, and only when, there has been an open and unequivocal breach or repudiation of the trust, * * *."

IX. Statute governing creation of trusts in real estate provides: Section 557.10, Code of Iowa:

"Declarations of trust. Declarations or creations of trusts or powers in relation to real estate must be executed in the same manner as deeds of conveyance; *but this provision does not apply to trusts resulting from the operation or construction of law.*" (Emphasis ours.)

▬▬ The trust in the case at bar has been partially performed. The payments were made to the parents of Robert and to Hubert.

In Hardy v. Daum, 219 Iowa 982, 987, 259 N.W. 561, it states:

"It is * * * the settled rule of law in this state that parol evidence is competent to impress an express trust upon an absolute deed, provided the trust has been wholly or partially executed. Ratigan v. Ratigan, 181 Iowa 860, 162 N.W. 580, 165 N.W. 85; Hayes v. Dean, 182 Iowa 619, 164 N.W. 770; Nolan v.

Guggerty, Admrx., 187 Iowa 980, 174 N.W. 706; Kelley, Admr., v. Kelley, 189 Iowa 311, 177 N.W. 45; Neilly v. Hennessey, 208 Iowa 1338, 220 N.W. 47; Johnston v. Jickling, 141 Iowa 444, 119 N.W. 746; Morris Furn. Co. v. Braverman, 210 Iowa 946, 230 N.W. 356; Schurz v. Schurz, 153 Iowa 187, 128 N.W. 944, 133 N.W. 683; McCormick Harv. Machine Co. v. Griffin, 116 Iowa 397, 90 N.W. 84.

"Likewise, parol evidence may be introduced to establish an oral agreement for the creation of an interest in real estate where the purchase money or any portion thereof has been received by the vendor (Code, section 11286), or where it is established by the oral evidence of the adverse party (Code, section 11288)."

X. Appellees contend the conditions of statute of frauds have not been complied with. Section 622.32, Code of Iowa, 1958, provides:

"Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent: * * *

"3. Those for the creation or transfer of any interest in lands, except leases for a term not exceeding one year.

"4. Those that are not to be performed within one year from the making thereof."

In support of their position that the statute of frauds has not been complied with, appellees primarily contend that the memorandum of December 2, 1929, and the agreement of May 18, 1932, are not effective, and there was no part performance which can be recognized by a court of equity.

Appellees cite Fairall v. Arnold, 226 Iowa 977, 285 N.W. 664, and certain quotations from previous cases in support thereof.

Quoting from page 987 of 226 Iowa, where Judge BLISS quoted from the earlier Iowa case of Williamson v. Williamson, 4 (Clarke) Iowa 279, 282, we said: " 'If a party would take a case out of the statute of frauds, upon the ground of a part performance, it is indispensable that the parol contract, agreement or gift should be established by clear, unequivocal and definite testimony; and the acts claimed to be done thereunder, should

be equally clear and definite, *and referable exclusively to the said contract or gift.'*"

While appellees strenuously deny the fact, it appears to this court that part performance of the trust established on December 2, 1929, was established by clear, unequivocal and definite testimony, as heretofore set out.

In Volume I, section 50, of Scott on Trusts, Second Ed., the following is stated: "Although the cases involving oral trusts are not nearly as numerous as those involving oral contracts, the doctrine that part performance is sufficient to make an oral trust enforceable in spite of the statute of frauds is well settled. There are many cases in which the court has held that because of part performance the oral trust is enforceable * * *."

In section 46 of Scott, supra, referring to the memorandum of December 2, 1929, and the agreement of May 18, 1932, and the statute of frauds, the text states:

"46. *What the memorandum must contain.* Although the memorandum required by the statute of frauds may be any writing, whether formal or informal, signed by the proper party, it is not sufficient unless it shows with reasonable definiteness, the trust property, the beneficiaries, and the extent of the interests of the beneficiaries or the purposes of the trust. It is sufficient, however, if these things appear in the memorandum with reasonable definiteness. * * *."

Section 42.2 of Scott, supra: "Since the trustee is the party to be charged with the trust, a memorandum signed by him is sufficient to satisfy the requirements of the statute of frauds."

Section 42.3 of Scott, supra: "A memorandum signed by the transferee is sufficient although signed subsequent to the transfer to him."

The document of December 2, 1929, and Exhibit 52 ratifying the trust, describes in detail the Eugene K. Butler real estate by legal description and the personal property which is described as "Sundry bonds and securities of the value of approximately five hundred thousand (500,000) dollars."

XI. Appellees allege the "Clean Hands" doctrine bars Earle from relief in this Court of Equity.

They contend Eugene and Sarah Butler transferred their property to Robert for two purposes: 1st, to prevent Hubert's

creditors from securing any of their property. 2nd, to save inheritance taxes.

This case involves only the actions of Earle; not those of his parents, nor of Robert. The specific allegation made by appellees against Earle is that in 1942, when Hubert and Margaret sued Robert, Earle advised Hubert to settle, and failed to tell Hubert and Margaret about the documents of December 2, 1929, and May 18, 1932. We have considered the matter of the documents, supra, in Margaret's case, Division III.

Earle's advice to Hubert was in fact a wholesome brotherly gesture. Hubert had sued for one third of the property transferred to Robert. Earle's recommendation to Hubert was that instead of securing a substantial amount of property, on which his many creditors could pounce, he should settle for a monthly allowance for life which would maintain him and Margaret. In addition to $16,500 cash to pay certain specific items, a settlement of $500 per month for life was arranged.

It is true Eugene and Sarah Butler were fearful of Hubert's creditors making some inroads on the Butler fortune. This was doubtless an incentive for transfer of the property to Robert. But Earle had nothing to do with it.

There was an inheritance tax proceeding in Chicago as to the Illinois property deeded to Robert. Robert resisted the action, and won it, but at the trial gave testimony hard to believe. Earle had nothing to do with the proceeding; either as a witness or otherwise.

The record fails to disclose any incident on the part of Earle where his hands can be called "unclean."

There are certain well established principles as to the doctrine of "unclean hands" in equity.

The defense of the "clean hands" doctrine is not favored by the courts. That this is true is shown by the language used in the case of Farmers Educational and Coop. Union v. Farmers Educational and Coop. Union, 141 F. Supp. 820, 824. The opinion in this case is written by the Judge for the Southern District of Iowa in the year 1956. In the opinion the court said: "The defense of unclean hands is reluctantly applied by the courts and is always scrutinized with a very critical eye. Coca Cola v. Koke Co., 254 U. S. 143, 41 S. Ct. 113, 65 L. Ed. 189."

1. The acts of Earle, above outlined, do not affect the subject matter of this case.

2. Appellees were not prejudiced by any statements or acts of Earle. Barnes v. Barnes, 282 Ill. 593, 118 N.E. 1004, 4 A. L. R. 4; Carr v. Craig, 138 Iowa 526, 532, 116 N.W. 720; Samasko v. Davis, 135 Conn. 377, 64 A.2d 682; Batesville Truck Line v. Martin, 219 Ark. 603, 243 S.W.2d 729; First National Bank of Ottawa v. Weise, 333 Ill. App. 1, 76 N.E.2d 538; Pomeroy's Equity Jurisprudence, Fifth Ed., section 399; Thomas v. Klemm, 185 Md. 136, 43 A.2d 193.

In Carr v. Craig, supra, this court said:

"The equitable rule that a plaintiff asking relief must come into equity with clean hands has reference only to the relations between the parties, and arising out of the transaction. 'It does not extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party had no concern.' Chicago v. Union Stock Yards, etc., Co., 164 Ill. 224 (45 N.E. 430, 35 L. R. A. 281); 1 Pomeroy, Equity (2d Ed.), section 399."

The court in Samasko v. Davis, supra, said: "That the maxim cannot avail the defendant in this instance is clear; it 'only applies to the particular transaction under consideration, for the court will not go outside the case for the purpose of examining the conduct of the complainant in other matters or questioning his general character for fair dealing. The wrong must * * * be in regard to the matter in litigation.' Lyman v. Lyman, 90 Conn. 399, 406, 97 A. 312, 314, L. R. A. 1916E 643." (Page 383 of 135 Conn.)

In Batesville Truck Line v. Martin, supra, the court stated: " 'The wrong which may be invoked to defeat the suit must have an "immediate and necessary relation" to the equity which the complainant seeks to enforce against defendant or it must "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." If the wrong is shown to be merely collateral to the complainant's cause of action, it does not constitute matter of defense.' " (Page 609 of 219 Ark.)

The court said at page 13 of 333 Ill. App. in First National Bank v. Weise, supra: "To permit a party to avail himself of

the 'clean hands' doctrine obtaining in equity courts, the inequitable conduct must be directed toward the defendant, *and effect the equitable relations subsisting between the two parties and arise out of the transaction.*" (Emphasis ours.)

Pomeroy Equity Jurisprudence, supra, section 399, pages 95-99, states: "*A court of equity is not an avenger of wrongs committed at large by those who resort to it for relief, however careful it may be to withhold its approval from those which are involved in the subject-matter of the suit, and which prejudicially affect the rights of one against whom relief is sought.* The rule does not go so far as to prohibit a court of equity from giving its aid to a bad or a faithless man or a criminal. The dirt upon his hands must be his bad conduct in the transaction complained of. If he is not guilty of inequitable conduct toward the defendant in that transaction, his hands are as clean as the court can require. * * *

"The party to a suit, complaining that his opponent is in court with 'unclean hands' because of the latter's conduct in the transaction out of which the litigation arose, or with which it is connected, must show that he himself has been injured by such conduct, to justify the application of the principle to the case. The wrong must have been done to the defendant himself and not to some third party." (Emphasis ours.)

In Thomas v. Klemm, supra, the court said at page 142 of 185 Md.: "It is an accepted rule that if the alleged wrongful conduct of a complainant appears not to have injured the defendant, the maxim [clean hands] cannot be successfully invoked."

XII. Appellees contend the establishment of a trust as to the property deeded and assigned to Robert on December 2, 1929, would be void, as being in violation of our statutory provision against perpetuities. The Iowa Statute is section 558.68, as follows: "Perpetuities prohibited. Every disposition of property is void which suspends the absolute power of controlling the same, for a longer period than during the lives of persons then in being, and twenty-one years thereafter."

Appellees' statement is that if the agreement of May 18, 1932, establishes a trust as appellants contend "the * * *

agreement might not become possessory within the period of perpetuities."

Appellees argue further: "Both plaintiffs assert that there was to be no ultimate distribution of principal until the estate tax and inheritance matters had been settled and debts had been paid for E. K. Butler's Estate. It is obvious that no one could foresee when those matters would be definitely terminated; hence, the period might well have exceeded the allowable period of lives in being and twenty-one years."

As we are establishing that Earle is a cestui que trust of the trust which was administered by Robert, Earle's one-third share became vested on December 2, 1929. As to his share, Robert's only interest was administration and fulfilling certain conditions of the trust such as care of the parents, of Hubert, and payment of inheritance and other taxes.

In Bankers Trust Co. v. Garver, 222 Iowa 196, 201, 202, 268 N.W. 568 (also cited by appellees), it is stated:

"A perpetuity is any limitation or condition which may take away or suspend the absolute power of alienation of an estate for a period beyond life or lives in being and twenty-one years thereafter. The rule against perpetuities has no application to *vested* estates. 21 R. C. L. 288; In re Lilley's Estate, 272 Pa. 143, 116 A. 392, 28 A. L. R. 366."

In Wagner v. Wagner, 248 Iowa 353, 359, 360, 79 N.W.2d 319, states: "The wording of our statute of course does not conform in all respects with the common-law rule which was evolved by judicial and not legislative processes. The statement in 70 C. J. S., Perpetuities, section 3, may be accepted as an accurate statement of the common-law rule: No interest is good 'unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest, * * *.'

"We must agree that our statute, though not mentioning the word, does relate to the time of vesting. Our decisions quite generally so assume. See Commentary by Prof. Robert W. Swenson, 36 I. C. A. 747; Phillips v. Harrow, 93 Iowa 92, 106, 61 N.W. 434; In re Estate of Trimble, 234 Iowa 994, 997, 14 N.W.2d 673; Bankers Trust Co. v. Garver [supra]. See also Restatement, Trusts, section 411."

Also see Restatement of Trusts 2d, section 62(r): "r. Remoteness, administrative powers. Where a trust is created which may continue for a period longer than that of the rule against perpetuities, but the trust is valid because all interests vest within the period, administrative powers conferred upon the trustee, such as power to sell, to lease, to mortgage, to invest, are valid, although they may be exercised after the expiration of the period."

In Scott on Trusts, Second Ed., 1956, section 62.10(2), it is stated:

"(2) Duration of trusts. If all the interests under a trust vest within the period of the rule against perpetuities, the fact that the trust may continue beyond the period does not invalidate it."

In addition to the above clear precedents as to trusts, we would observe that the arguments of appellees as to inheritance taxes and debts of Eugene K. Butler, not being paid within 21 years after Earle's death, are so "iffy" and so unlikely, that the possibility of the statute against perpetuities ever becoming effective is in truth nonexistent.

XIII. When the net one-third amount due Earle is determined by agreement between the parties, or by decree of a court of equity, the amount shall be the property of Earle as cestui que trust payable from the R. S. Butler Trust. Robert had no authority to transfer Earle's one third of the Eugene K. Butler property to himself. He had no authority to transfer it from himself to the R. S. Butler Trust. Robert made a provision in the trust agreement for payment of claims against himself, in Article XIV of the agreement, as follows:

"*Section 1.* Upon the death of the Settlor the Trustees shall pay from Trust B all of the Settlor's legal debts, and expenses of last illness and funeral in the event there are insufficient assets in the decedent's probate estate to pay such charges."

Earle is also the owner of one third of the Cameron County, Texas, land not yet sold, and one third of the oil and mineral rights reserved as to such property when sale of part of the tract was made by Robert.

Earle's share, therefore, is one third of the proceeds of sale of the real property, and one third of the sale value of the personal property, deeded and assigned by Eugene K. Butler and wife to Robert S. Butler on December 2, 1929; plus one third of the income of such property throughout the intervening years until final accounting; less taxes, proper expenses, legitimate losses, if any, and the $52,258.25 paid by Robert to his parents. The $152,305.65 paid to Hubert and Margaret, by Robert, shall be considered paid from the other two thirds of the Eugene K. Butler property.

The decision of the trial court is affirmed as to Margaret S. Butler, and reversed as to Edward Earle Butler.—Affirmed in part; reversed in part.

All JUSTICES concur except HAYS, J., who concurred in the result.